**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**STEPHEN BEECHER, Individually and on Behalf of All Others Similarly Situated,**

      **Plaintiff,**

         **vs.**

**TWC ADMINISTRATION LLC,**
**Defendant.**

**Case No. 1:15-cv-00154-WMS-JJM**


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. PROCEDURAL HISTORY ............................................................................................. 3

III. BACKGROUND ............................................................................................................. 4

    A. Plaintiffs' Job Duties .............................................................................................. 4

    B. TWC's Voluntary Start From Home Program ........................................................ 5

    C. Beecher's Alleged Pre- and Post- Shift Activities ................................................. 5

        a. Obtaining Routing Information .................................................................. 5

        b. Reviewing Work Orders and Verifying He Had Equipment ..................... 6

        c. Reading and Responding to Emails and Messages .................................... 7

        d. "Inspecting" Vehicle ................................................................................. 7

        e. "Loading Equipment" into Van ................................................................ 8

        f. Pre-calling First Customer ........................................................................ 8

        g. Fueling Vehicle ......................................................................................... 9

        h. Commuting from Home to First Job ......................................................... 9

        i. Commuting from Last Job to Home .......................................................... 9

        j. "Unloading" and Charging Equipment ..................................................... 9

    D. Plaintiffs Were Provided 30-Minute Lunch Breaks and Were Required to
Report If They Did Not Take a Full Break So That TWC Could Pay Them for
that Time ............................................................................................................... 10

IV. ARGUMENT AND CITATION TO AUTHORITY ..................................................... 12

    A. Legal Standards .................................................................................................... 12

        1. Summary Judgment ................................................................................. 12

        2. The New York Labor Law Follows the FLSA ......................................... 13

    B. Beecher's Commute-Time Claim Fails as a Matter of Law ................................. 14

    C. Beecher's Other Pre-Shift and Post-Shift Claims Fail as a Matter of Law .......... 16

        1. Beecher's Alleged Activities Are Incidental to His Commute and Thus
Not Compensable ..................................................................................... 16

        2. There Is No Evidence That TWC Knew or Should Have Known That
Beecher Performed Certain Alleged Pre-shift Work Off the Clock ......... 19

    D. Plaintiffs' Lunch Claims Fail as a Matter of Law ............................................... 19

        1. Plaintiffs Cannot Identify Any Compensable Lunch Breaks .................... 20

        2. Plaintiffs Cannot Show Any Occasion Where TWC Should Have Been
Aware of a Compensable Break Yet Failed to Pay for Same .................... 21

       3.     Plaintiffs' Lunch Break Claim Fails Because It Is Entirely Speculative .. 22

   E.     Plaintiff's "Gap Time" Claims Fail ...................................................................... 23

**V.**   CONCLUSION .............................................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Addickes v. S.H. Kress and Co.*,
  398 U.S. 144 (1970)................................................................................13

*Ahle v. Veracity Research Co.*,
  738 F. Supp. 2d 896 (D. Minn. 2010).....................................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................12, 13

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946)................................................................................22

*Baker v. GTE North, Inc.*,
  110 F.3d 28 (7th Cir. 1997) ...................................................................14

*Bethune v. TW Telecom Holdings, Inc.*,
  No. 10 Civ. 7925, 2011 WL 856173 (S.D.N.Y. Mar. 9, 2011) ..............15

*Brand v. Comcast Corp.*,
  No. 12 CV 1122, 2015 U.S. Dist. LEXIS 130114 (N.D. Ill. Sept. 28, 2015)..............17, 19, 23

*Brown v. Family Dollar Stores, L.P.*,
  534 F.3d 593 (7th Cir. 2008) .................................................................22

*Butler v. DirectSat USA, LLC*,
  55 F. Supp. 3d 793, 807-09 (D. Md. 2014).............................................17

*Buzek v. Pepsi Bottling Group, Inc.*,
  501 F. Supp. 2d 876 (S.D. Tex. 2007) ...................................................17

*Chambers v. Sears Roebuck & Co.*,
  428 Fed. App'x 400 (5th Cir. 2011) .......................................................19

*Chambers v. Sears Roebuck & Co.*,
  793 F. Supp. 2d 938 (S.D. Tex. 2010) ...............................................17, 19

*Colella v. City of New York*,
  986 F. Supp. 2d 320 (S.D.N.Y. 2013)...............................14, 15, 17, 19

*Debejian v. Atl. Testing Labs., Ltd.*,
  64 F. Supp. 2d 85 (N.D.N.Y. 1999) .......................................................13

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
   770 F. Supp. 2d 497 (E.D.N.Y. 2011) ..................................................................13

*Donatti v. Charter Commc'ns*,
   950 F. Supp. 2d 1038 (W.D. Mo. 2013) ..............................................................19

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ...............................................................................22

*Espenscheid v. DirectSat USA, LLC*,
   No. 09-cv-625-bbc, 2011 WL 10069108 (W.D. Wis. Apr. 11, 2011) ....................17

Fengler v. Crouse Health Foung, Inc., 595 F. Supp. 2d 189 (N.D.N.Y. 2009) ............21

*Hernandez v. NJK Contrs., Inc.*,
   No. 09-CV-4812, 2015 U.S. Dist. LEXIS 57568 (E.D.N.Y. May 1, 2015) ...........14

*IBP, Inc. v. Alvarez*,
   546 U.S. 21 (2005)................................................................................................16

*Joiner v. Bd. of Trs. of the Flavius J. Witham Mem'l Hosp.*,
   No. 1:13-cv-555-WTL-DKL, 2014 WL 3543481 (S.D. Ind. July 17, 2014).........23

*Joza v. WW JFK LLC*,
   No. 07-CV-4153, 2010 U.S. Dist. LEXIS 94419 (E.D.N.Y. Sept. 9, 2010) ....13, 22

*Kavanagh v. Grand Union Co.*,
   192 F.3d 269 (2d Cir. 1999)..................................................................................14

*Kirkendall v. United Parcel Service, Inc.*,
   964 F. Supp. 106 (W.D.N.Y. 1997) ........................................................................1

*Kolesnikow v. Hudson Valley Hosp. Ctr.*,
   622 F. Supp. 2d 98 (S.D.N.Y. 2009).....................................................................23

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001)..................................................................................16

*Lamon v. City of Shawnee*,
   972 F.2d 1145 (10th Cir. 1992) ............................................................................20

*Lundy v. Catholic Health Sys. of Long Island, Inc.*,
   711 F.3d 106 (2d Cir. 2013)............................................................................23, 24

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..............................................................................................13

*McGlone v. Contract Callers Inc.*,
   No. 11-cv-3004, 2015 U.S. Dist. LEXIS 94381 (S.D.N.Y. July 20, 2015)...........24

*Mendez v. Radec Corp.*,
    232 F.R.D. 78 (W.D.N.Y. 2005)...........................................................................20

*Millington v. Morrow Cty. Bd. of Comm'rs*,
    No. 2:06-cv-347, 2007 WL 2908817 (S.D. Ohio Oct. 4, 2007) .............................23

*Reich v. Southern New England Telecom. Corp.*,
    121 F.3d 58 (2d Cir. 1997)...................................................................................20

*Reiseck v. Universal Commc'ns of Miami, Inc.*,
    591 F.3d 101 (2d Cir. 2010)..................................................................................13

*Rutti v. Lojack Corp.*,
    596 F.3d 1046 (9th Cir. 2010) .........................................................................14, 17

*Smith v. Aztec Well Serv. Co.*,
    462 F.3d 1274 (10th Cir. 2006) ............................................................................19

*Topo v. Dhir*,
    No. 01 Civ. 10881 (PKC), 2004 WL 527051 (S.D.N.Y. Mar. 16, 2004) ...............13

*Wolman v. Catholic Health Sys. of Long Island, Inc.*,
    853 F. Supp. 2d 290 (E.D.N.Y. 2012) ..................................................................21

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)...................................................................19

**Statutes**

Employee Commuting Flexibility Act, 29 U.S.C. § 254(a).............................................17

New York Labor Law §§ 190, *et seq.*, and §§ 160, *et seq.* ............................................3

**Other Authorities**

Fed. R. Civ. P. 56(c)(2)...............................................................................................12

N.Y. Comp. Codes R. & Regs tit. 12, § 142-2.2...........................................................13

## I.      INTRODUCTION

Plaintiffs Stephen Beecher, Ryan Dueringer, Lamar Reeves and Marvin Wilson—all former Field Technicians ("FTs") for Defendant TWC Administration LLC ("TWC")—assert various wage and hour claims.  Beecher's claims are based on his voluntary participation in TWC's Start From Home Program ("SFH Program"). The SFH Program allows FTs to take a Company van home and use it for their commute each day, thus saving the FTs time, fuel costs, and wear and tear on the personal vehicles they would otherwise use to commute between their homes and TWC's facilities.  Given that FTs who choose to participate in the program do so because it benefits them, Beecher's attempt to paint the SFH Program as a devious scheme to squeeze uncompensated work out of FTs is a red herring.  In any event, current FTs need not worry that Beecher's lawsuit will sound the death knell of the SFH Program, as his claims are without merit and all fail as a matter of law, as shown below.

Beecher (but not Dueringer, Reeves or Wilson) claims that TWC violated the New York Labor Law ("NYLL") by not paying him for time allegedly spent commuting to and from work in a Company van.[1]  This claim fails because it is well-settled that home to work travel is not compensable.  The fact that Beecher chose to use a Company van for his commute does not transform that quintessential non-compensable activity into work time.

Likewise, Beecher's claim for compensation for various pre-shift activities he allegedly performed off the clock also fails as a matter of law, as all of the activities of which he complains were merely incidental to his commute or took no extra time at all.  For example, while Beecher

---

[1] Beecher is the sole named class representative for the class claims in this case (Counts I and II in the FAC).  Thus, TWC's discussion regarding alleged pre-shift, post-shift and commuting activities is limited to Beecher only.  *See Kirkendall v. United Parcel Service, Inc.*, 964 F. Supp. 106, 112 (W.D.N.Y. 1997) (dismissing class complaint on summary judgment after concluding class representative's individual claims failed as matter of law).

seeks compensation for time spent looking up the location of his jobs and de-icing, safety-inspecting and refueling the company van, courts have consistently held that employees who choose to commute in company vehicles are not entitled to compensation for those activities because they are incidental to commuting in a company vehicle.  For the same reason, courts have also rejected Beecher's claim for time spent "loading and securing certain equipment" prior to his shift, as that too is merely incidental to his voluntary use of the Company van to commute.  That claim also fails because it is specious:  the only "equipment" Beecher "loaded" was his laptop, cell phone and signal meter -- all of which he simply carried with him to his van.

Beecher's claim for pre-shift time spent reviewing work orders and verifying that he had certain equipment fails not only because such tasks were incidental to his commute, but also because there is not a shred of evidence that TWC knew Beecher was allegedly performing those activities off-the-clock, in violation of TWC's policies.  Beecher's claim that he read and responded to emails, messages or phone calls while off-the-clock fails for the same reasons.  As a matter of law, TWC cannot be held liable for off-the-clock work of which it was unaware and which occurred, if at all, in violation of the Company's polices.[2]

Beecher's claim for post-shift work is limited to his assertion that he had to bring his laptop, cell phone and signal meter into the house and recharge these items at night.  That claim fails, as those activities: (1) were incidental to his use of the van to commute; and (2) took no extra time, as Beecher merely carried these items with him when he walked from his van into his home.  Beecher also admitted that when he chose to charge this equipment at home -- rather than using the van's charging station during his workday -- it took only moments to plug in his equipment at home.  Any such time is *de minimis* and thus not compensable as a matter of law.

---

[2]  Beecher's claim for time spent fueling his vehicle off the clock also fails for this same reason, in addition to the fact that it was incidental to his commute, as discussed above.

The Complaint also alleges individual claims based on TWC's alleged failure to pay Beecher, Dueringer, Reeves and Wilson for time they allegedly spent working during their 30-minute lunch breaks.  This claim is remarkable given that all four Plaintiffs admit they routinely took lunch breaks that were far longer than the 30 minutes that TWC deducted from their pay for lunch each day.  In any event, Plaintiff's claims fail because: (1) it is undisputed that TWC told Plaintiffs they must take their lunch break each day and that if they were unable to do so they must inform their supervisors so that TWC could pay them for that time; and (2) there is no evidence that any Plaintiff was ever denied compensation when he followed this procedure or when TWC was otherwise aware that he had not had a proper 30-minute lunch break.  To the extent any Plaintiff failed to follow the policy and notify his supervisor that he did not receive an uninterrupted 30-minute break, the law is clear that TWC cannot be liable for failing to pay Plaintiffs for time TWC was unaware they worked.[3]

Accordingly, TWC is entitled to summary judgment against all of Plaintiffs' claims.

## II.      PROCEDURAL HISTORY

Beecher filed this case as a class and collective action on January 17, 2015.  [DE 1.]  On October 27, 2015, Beecher and three other former FTs from Buffalo -- Dueringer, Reeves, and Wilson -- filed a First Amended Complaint ("FAC") containing two claims brought on a putative class action basis and four claims brought on an individual basis.  [DE 42.]  Specifically, Counts I and II of the FAC allege classwide violations of New York Labor Law ("NYLL") §§ 190, *et seq.*, and §§ 160, *et seq.* by failing to pay Beecher and the putative class for time spent: (1) completing pre-shift work; (2) traveling to the first job of the day; (3) traveling home from the last job of the day; and (4) completing post-shift work.  [DE 42, ¶¶50, 60.]

---

[3]  These claims also fail because Plaintiffs can only speculate as to how often their lunch breaks were allegedly interrupted, and they thus cannot support their request for damages.

The remaining four counts in the FAC are brought as individual claims.  Those claims are based on Plaintiffs' contention that TWC failed to pay them for time worked during their meal periods.  Specifically, Plaintiffs contend TWC automatically deducted 30 minutes for their lunch break every day, but they were sometimes forced to perform job duties during that break time. [*Id.* at ¶68.]  Consequently, Plaintiffs contend that TWC owes them wages for that time under the NYLL and the Fair Labor Standards Act ("FLSA").  [*Id.* at ¶¶68-69, 74, 78, 80, 91, 103.]

### III.      BACKGROUND[4]

**A.      <u>Plaintiffs' Job Duties</u>**

Beecher worked as an FT out of TWC's Buffalo, NY facilities from August 7, 2009 until June 24, 2013.  (SUF ¶1.)  Dueringer, Reeves, and Wilson all worked in the same position out of Buffalo and/or nearby offices.  (SUF ¶¶2-4.)  Dueringer was employed from November 2, 2007 until July 13, 2014, Reeves from August 1, 2006 until August 3, 2014, and Wilson from August 1, 2006 until April 22, 2012.  (SUF ¶¶2-4.)

As FTs, Plaintiffs were responsible for installing, troubleshooting, repairing, and disconnecting TWC's services at customer residences, which required Plaintiffs to travel to customer locations to perform their jobs.  (SUF ¶5.)  Plaintiffs were notified of their jobs, including the customer address where the work was to be performed, via a software program called "WorkAssure" or "I&R," which they could access through their Company-issued laptops. (SUF ¶6.)  TWC provided Plaintiffs with service vans equipped with tools, parts and other items necessary for them to carry out their job responsibilities.    (SUF ¶7.)    Plaintiffs were compensated on an hourly basis, and frequently received overtime pay during their employment. (SUF ¶8.)

---

[4] Pursuant to Local Rule 56, TWC files its Statement of Undisputed Material Facts ("SUF") herewith.

**B.**     <u>**TWC's Voluntary Start From Home Program**</u>

FTs in the facilities where Plaintiffs worked had the option to participate in TWC's SFH Program.  (SUF ¶9.)  If an FT elected to participate in the Program, the FT was permitted to drive his or her TWC van home at the end of the day instead of returning it to their assigned facility, and then to use the van to commute from their home directly to their first job in the morning.  (SUF ¶10.)  The SFH Program is voluntary.  (SUF ¶11.)  Beecher chose to participate in the SFH program and was aware of TWC's policies applicable to individuals who participated in that program.  (SUF ¶18.)

The policies applicable to the SFH Program were set forth in two written documents during Beecher's employment.  (SUF ¶12.)  Notably, the Northeast Technical Operations Work-From-Home Policy specifically states that "***[n]o work is to be done by technicians prior to arrival at the customer location and logging into work to start the day***."  (SUF ¶13 (emphasis added).)  Thus, the *only* activity that FTs who chose to take the Company van home with them were allowed to do prior to clocking in was logging into WorkAssure to determine the address of their first job location.  (SUF ¶16.)

**C.**     <u>**Beecher's Alleged Pre- and Post- Shift Activities**</u>

Beecher seeks compensation for time allegedly spent performing various activities before clocking in for his shift and after clocking out at the end of the day.  The relevant factual background pertaining to each of those allegations is addressed separately below:

a.     <u>Obtaining Routing Information</u>

Beecher seeks compensation for time spent booting up his Company-supplied laptop and loading the WorkAssure program each morning prior to his shift.  (DE 44-18 ¶12.)  Beecher's normal practice was to start powering up the computer in the morning, finish getting ready for the day, and then return to access WorkAssure.  (SUF ¶20.)  He estimated that the total time it

took to accomplish this routine was approximately nine (9) minutes.  (SUF ¶19.)  These activities were part and parcel of using the Company vehicle to commute, as WorkAssure was the means by which Beecher would obtain the address of his first job, to which he would commute from his house.  (SUF ¶21.)[5]

> b.  <u>Reviewing Work Orders and Verifying He Had Equipment</u>

Beecher alleges that he would also spend time prior to his shift "reviewing work orders for at least [his] first job of the day to determine . . . the equipment [he] would need[.]"  (DE 44-18 ¶13.)[6]  Notably, however, Beecher admits that:

- Performing those activities off-the-clock violates TWC policy.  (SUF ¶25);

- He never told his supervisor he was doing these activities off-the-clock (SUF ¶26); and

- He was never told to review work orders or conduct any sort of inventory prior to clocking in.  (SUF ¶24.)

---

[5]  Beecher also contends that he had to spend time "determining a route to [his] first job-site of the day (such as by using [his] GPS[.]"  (DE 44-18 ¶ 13).)  This allegation is curious given that Beecher admitted during his deposition that he was normally routed in the same area during his employment with TWC, and that he would likely know off of the top of his head how to get to any given address in the area.  (SUF ¶22.)  In any event, any time spent determining how to get to a job location is merely incidental to Beecher's commute, and thus not compensable, as shown *infra*.

[6]  As an initial matter, Beecher's allegation that he had to spend time in the morning verifying what equipment he had on his van is incredulous, as he stated during his deposition that he knew at the end of each day what equipment was on the vehicle.  (SUF ¶27.) When asked why he would look at the inventory in the van each morning if he already knew the equipment levels from the previous day, Beecher claimed he would look to "refresh" his memory.  (Beecher Dep. 291:24-92:14.)

Indeed, Beecher fully admits there were numerous occasions when he did ***not*** review work orders or check inventory prior to commuting to his first job.  (SUF ¶28.)  Thus, obviously, Beecher was neither required nor expected to perform these activities prior to clocking in.[7]

        c.       Reading and Responding to Emails and Messages

Beecher alleges that he would spend time "communicating with other technicians . . . to obtain required equipment" and "checking emails regarding the zone in which [he] worked" prior to the start of his shift.  (DE 44-18 ¶13.)  As with Beecher's allegation that he reviewed work orders off-the-clock, however, Beecher never informed his supervisor that he was engaging in these activities off-the-clock.  (SUF ¶32.)

Furthermore, TWC policy explicitly forbids non-exempt employees from reading or responding to emails, answering or sending work-related messages, or participating in work-related phone calls during times that they are not clocked in.  (SUF ¶34.)  These policies were continually reinforced by Beecher's supervisor during his employment.  (SUF ¶35.)  Thus, to the extent Beecher was, in fact reviewing emails or communicating with other FTs regarding work-related matters while off-the-clock, he was doing so in violation of Company policy and without his supervisor's knowledge.  (SUF ¶33.)

        d.       "Inspecting" Vehicle

Beecher also alleges that each morning prior to clocking in he spent time "performing a routine check of [his] vehicle for safety and to ensure no damage or missing equipment."  (DE 44-18 ¶13.)  Beecher's morning "check," however, involved simply walking around the van to

---

[7] TWC's policies specifically prohibited Beecher from conducting an "inventory" or otherwise verifying that he had certain equipment while he was off the clock.  (SUF ¶29.)  To the extent Beecher believed he was missing necessary equipment, he was supposed to contact his supervisor and continue working while awaiting delivery of the equipment or further instructions from his supervisor.  (SUF ¶30.)

make sure it was safe to drive and that the entire process took no more than a minute.  (SUF ¶36.) The only purpose for walking around the van was to confirm it was safe to drive and took only take a few seconds.  (SUF ¶37.)[8]

   e.  "Loading Equipment" into Van

  Beecher alleges that he was also required to "load" certain equipment into the Company van each morning prior to clocking in.  (DE 44-18 ¶13.)  Beecher admitted during his deposition, however, that the only equipment he took with him into the house at night and therefore had to "load" in the morning was his laptop, cell phone and a signal meter the size of a tissue box. (SUF ¶38.)  Notably, Beecher was able to carry all three of those items from his house to the van when he walked to the vehicle in the morning.  (SUF ¶39.)[9]

   f.  Pre-calling First Customer

  Beecher alleges that he sometimes would pre-call customers prior to clocking in for his shift.  (DE 44-18 ¶16.)  Beecher admits, however, that TWC did not require him to pre-call the first customer of the day.  (SUF ¶41.)  This fact is further proven by Beecher's admission that he often did not pre-call the first customer.  (SUF ¶42.)  Further, on those occasions where Beecher claims he did pre-call customers while off the clock, his supervisor was unaware that he was doing so.  (SUF ¶43.)

---

[8] During his deposition, Beecher also claimed that he sometimes spent time clearing the van of snow and ice while off the clock.  He acknowledged, however, that this activity was necessary for safety reasons and that he would have to do the same thing if he was driving his personal vehicle.  (SUF ¶40.)

[9] The SFH policy further provides that only valuable equipment such as meters and laptops, needs to be taken in to the FT's home at the end of the day.  (SUF ¶51.)  Finally, the policy also provides that weekly vehicle inspections, washing, cleaning and organizing must be performed **during** the employee's shift.  (SUF ¶55.)

g.      Fueling Vehicle

Beecher alleges that, on some unidentified occasions, he fueled his Company van while off-the-clock.  (DE 44-18 ¶15.)  TWC's policy, however, explicitly required Beecher to be clocked in while fueling the van.  (SUF ¶44.)  Beecher's supervisor was unaware of any occasion where Beecher violated that policy.  (SUF ¶45.)  If she had known Beecher had fueled his van off-the-clock, she would have ensured that he was compensated for that time.  (SUF ¶46.)

h.      Commuting from Home to First Job

Beecher alleges that "at times" he commuted part or all of the way from his home to his first job without being clocked in.  (DE 44-18 ¶14.)  Notably, while TWC policy generally required Beecher to clock in at the start of his shift after at least beginning the drive to the first job location (SUF ¶47), he admits he sometimes clocked in before he left his house and commuted the entire time on the clock.  (SUF ¶48.)

i.      Commuting from Last Job to Home

While Beecher does not specifically assert in his recently-filed declaration that he commuted from his last job to his home off the clock, the FAC does contain such an allegation. (DE 42 ¶¶25(b), 34.)  As with Beecher's pre-shift commute, however, Beecher admits that there were numerous occasions when he commuted home **on** the clock.  (SUF ¶49.)

j.      "Unloading" and Charging Equipment

Beecher alleges that he spent time "unloading" certain equipment and charging it at his house while off-the-clock.  (DE 44-18 ¶19.)  As noted above, however, the only "equipment" Beecher was required to take into his house was the laptop, cell phone and signal meter, all of which he simply carried with him when he walked from his van into his home.  (SUF ¶50.) Thus, Beecher did not make a special trip for these items or otherwise spend any time "unloading" his vehicle.

Further, there was no need for Beecher to charge any items at his house as his Company van was equipped with a power invertor so he could charge equipment throughout the day. (SUF ¶51.) If Beecher chose to charge any items at his house, he did so without his supervisor's knowledge. (SUF ¶52.) Beecher also admits that plugging in the equipment took, at most, a few minutes, and that afterwards he typically did nothing else work-related until the next morning when he started his laptop.[10] (SUF ¶53.)

**D.** **Plaintiffs Were Provided 30-Minute Lunch Breaks and Were Required to Report If They Did Not Take a Full Break So That TWC Could Pay Them for that Time**

Beecher, Dueringer, Reeves and Wilson allege that, during some unidentified portion of their employment, they did not have to clock out and in for lunch because TWC would automatically deduct 30 minutes to account for their lunch break. (DE 42 ¶44.)[11] Plaintiffs' FAC alleges that this policy deprived them of compensable time because, on occasion, they were unable to take a full 30 minute for their lunches. (*Id.* ¶46.)

Plaintiffs acknowledged that their supervisors stressed to them that they must take a full lunch break each day. (SUF ¶58.) Each Plaintiff also admitted that TWC policy prohibited them from performing any work during their lunches while they were clocked out. (SUF ¶59.) Each Plaintiff also understood that he was required to inform his supervisor if, for any reason, he was unable to take a proper lunch break. (SUF ¶60.) The supervisors could then ensure that Plaintiffs were paid for that time. (SUF ¶61.)

Notably, Beecher could not recall any specific occasion where he was unable to take a full 30-minute lunch break. (SUF ¶62.) While Beecher vaguely claimed that he sometimes

---

[10] To the extent Beecher alleges he did perform other work-related activities after arriving home, he admits he did not inform his supervisor about those activities so that she could make sure he was paid for that time. (SUF ¶54.)

[11] Plaintiffs admit there was some period of time during their employment when they punched out and back in for their lunch periods. (SUF ¶56.)

performed various work-related tasks during his lunch,[12] he admitted that any attempt to estimate how many times this actually happened would be a "complete weird guess." (SUF ¶63.)  Beecher further admitted there is no way to determine whether he was interrupted on any particular day or how much time he allegedly had to spend on work-related matters during his lunch break.  (SUF ¶65.)  Further, despite understanding that he was required to report to his supervisor any occasions when he did not get to take his full 30-minute lunch, Beecher stated that he generally did not do so because it was too much trouble.  (SUF ¶66.)  Beecher testified that he thinks he may have told his supervisor that he had to work through lunch on some unidentified occasions, and that his supervisor may have credited him for the time he allegedly worked, but he did not know one way or the other.  (SUF ¶67.)

Like Beecher, Reeves could not identify any specific occasion when he was allegedly unable to take a full 30-minute lunch break.  (SUF ¶68.)  In addition, Reeves could not identify any specific work-related tasks that interrupted his lunch period on a particular day.  (SUF ¶69.)  Further, despite understanding that he was required to report to his supervisor any occasions where he did not get to take his full 30-minute lunch, Reeves stated he typically did not do so.  (SUF ¶70.)  Reeves also testified he may have told his supervisor he had to work through lunch on some unidentified occasions, and that his supervisor may have credited him for this time, but he did not know one way or the other.  (SUF ¶71.)

Likewise, both Dueringer and Wilson also conceded that they advised their supervisors of instances where they worked through lunch, and that their supervisors may have credited them for time allegedly worked in those instances, but they did not know for sure.  (SUF ¶¶72-73.)

---

[12] Beecher admits he was always able to take at least some time for lunch every day. (SUF ¶64.)

Like Beecher and Reeves, neither Dueringer nor Wilson could identify any instance where they were not paid for work performed during their meal break.  (SUF ¶¶74-75.)[13]

On the other hand, all of the Plaintiffs admit they routinely took **more** than the 30 minutes allotted for their lunch breaks, yet the Company still deducted only 30 minutes from their pay.  (SUF ¶¶78-81.)  Indeed, it was Reeve's typical routine to take a 50 to 60-minute meal break every day he worked—well over the 30 minutes TWC deducted for his lunch.  (SUF ¶79.)  Similarly, Dueringer and Wilson conceded that, like Reeves and Beecher, they both took meal breaks that greatly exceeded the 30 minutes that TWC deducted for their lunches.  (SUF ¶¶80-81.)  On these (common) occasions where Plaintiffs took more than 30 minutes for lunch, they were paid for time they did not, in fact, work.  (SUF ¶82.)

## IV.       ARGUMENT AND CITATION TO AUTHORITY

### A.   Legal Standards

#### 1.   Summary Judgment

Summary judgment is proper where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law."  *Id.*

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."

---

[13]  Dueringer and Wilson went on to acknowledge that the number of times when they worked through or missed a lunch break could not be determined merely by looking at TWC's records.  (SUF ¶¶76-77.)

*Addickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–59 (1970).  However, "[w]hen the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (emphasis in original).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.

    2.    <u>The New York Labor Law Follows the FLSA</u>

By rule, New York intends to follow, in close pursuit, the FLSA framework. *See* N.Y. Comp. Codes R. & Regs tit. 12, § 142-2.2. "While the measure of recovery in cases dually successful under these wage and hour laws will per force vary, the facts necessary to establish that a covered employee performed overtime work for which the employee has not received statutory overtime compensation will not. *Joza v. WW JFK LLC*, No. 07-CV-4153, 2010 U.S. Dist. LEXIS 94419, *18 (E.D.N.Y. Sept. 9, 2010) (citing *Pereira v. J. Sisters Hair Care Prods*., No. 08-CV-4537, 2010 U.S. Dist. LEXIS 53137, at *8 (S.D.N.Y. Apr. 5, 2010)).  As other federal courts have observed, "because NYLL provisions are 'substantially similar to the federal scheme,' analysis of overtime claims under federal law would apply equally to claims brought under the FLSA and New York law." *Debejian v. Atl. Testing Labs., Ltd.*, 64 F. Supp. 2d 85, 87 n.1 (N.D.N.Y. 1999).  That is, "[t]here is general support for giving [the] FLSA and the [NYLL] consistent interpretations." *Topo v. Dhir*, No. 01 Civ. 10881 (PKC), 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004); *see also Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010) (analyzing FLSA and NYLL claims together); *DeSilva v. N. Shore-Long*

*Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 510, n. 5 (E.D.N.Y. 2011) (explaining that NYLL claims are analyzed same as FLSA).  In fact, the NYDOL has explained that New York law is "in line" with the federal regulations with respect to issues related to travel time.  *See* N.Y. State Dept. of Labor Opinion Letter re: Request for Opinion Hours, Hours Worked, Travel Time, RO-10-0068 (May 7, 2010).[14]

## B.    Beecher's Commute-Time Claim Fails as a Matter of Law

Beecher contends that TWC violated the NYLL by not compensating him for all the time he spent commuting from his home to the first customer location of the day, and from the last customer location back to his home.  That claim fails as a matter of law because controlling law does not require employers to compensate employees for time spent commuting to and from work, even when those employees are driving company vehicles.

Notably, an employee's "[n]ormal travel between home and work is not worktime" and therefore not compensable.  *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272-73 (2d Cir. 1999); *citing* 29 C.F.R. § 785.35 ("ordinary home to work travel" not compensable work time regardless of whether employee "works at a fixed location or at different job sites.").  The same principle holds true when the employee is commuting in a company vehicle.  *See, e.g., Colella v. City of New York*, 986 F. Supp. 2d 320, 342 (S.D.N.Y. 2013) (time spent traveling between home and work locations in employer's vehicle not compensable); *see also, e.g., Rutti v. Lojack Corp.*, 596 F.3d 1046 (9th Cir. 2010) (same under federal law); *Baker v. GTE North, Inc.*, 110 F.3d 28, 29–31 (7th Cir. 1997) (same); *Hernandez v. NJK Contrs., Inc.,* No. 09-CV-4812, 2015 U.S. Dist. LEXIS 57568, *22 (E.D.N.Y. May 1, 2015) (employees not entitled to compensation under federal or New York law for time spent commuting from hotel to worksite in employer-provided

---

[14] A copy of the referenced opinion letter is attached as Exhibit 1 to the Declaration of Paul G. Sherman, submitted concurrently herewith.

van); *Bethune v. TW Telecom Holdings, Inc.,* No. 10 Civ. 7925, 2011 U.S. Dist. LEXIS 24514, at *6-8, 2011 WL 856173 (S.D.N.Y. Mar. 9, 2011) (same).

*Colella* is instructive, as the court granted summary judgment against the plaintiffs' claim for compensation for time spent traveling in a company vehicle from their homes to their work locations notwithstanding the plaintiffs' contention that they were subject to the employers' "strict rules" while operating the company vehicles. *Id.* at 340 (citing *Chambers v. Sears Roebuck & Co.*, 428 Fed. App'x 400, 411-13 (5th Cir. 2011) ("Nothing in the statutory scheme requires, or even implies, that such conditions on an employee's use of a company car, including the transportation of parts or tools, can transform an otherwise non-compensable commute into a compensable one.").)

Further, the New York State Department of Labor ("NYDOL") issued an opinion letter on May 7, 2010 confirming that commuting from home to the job in a company vehicle is not compensable under New York law. *See* N.Y. State Dept. of Labor Opinion Letter re: Request for Opinion Hours, Hours Worked, Travel Time, RO-10-0068 (May 7, 2010). In that letter, the NYDOL was asked to determine whether the time an employee spent commuting in a company vehicle from a designated parking spot rented by the employer to a customer location was compensable. *Id.* As noted above, the NYDOL explained that New York law is "in line" with the federal regulations for travel time. *Id.* The NYDOL then relied on federal law to draw a distinction between situations where the employee is commuting directly from home to the job – as Beecher complains of here – versus situations where the employee is required to drive from a designated meeting point to the job. *Id.* The NYDOL concluded that ***only in the latter situation***, where the employee must drive from a designated meeting point, is the time spent driving from there to the customer location compensable. *Id.*

Given the above authorities, Beecher's claim for compensation for ordinary home to job travel in his employer's vehicle fails as a matter of law.   Indeed, that very claim has been consistently and routinely rejected.   As such, the Court should grant summary judgment to TWC on Beecher's commuting-time claim.

**C.**     **Beecher's Other Pre-Shift and Post-Shift Claims Fail as a Matter of Law**

As discussed above, Beecher seeks compensation for myriad other activities he alleges he performed prior to clocking in or after clocking out.   As shown below, Beecher's claim for compensation for such activities fails as a matter of law for several reasons, including: (1) those activities are incidental to his choice to use the company van to commute and, therefore, not compensable; (2) TWC's policies specifically prohibit employees from performing many of these alleged activities off the clock, and there is no evidence that TWC knew or had reason to know that Beecher was (allegedly) violating those policies; and (3) some of these activities took so little time as to be *de minimis* as a matter of law, and thus not compensable.

1.     Beecher's Alleged Activities Are Incidental to His Commute and Thus Not Compensable

Preliminary and postliminary activities are only compensable where they are "an integral and indispensable part of the principal activity of the employment."   *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 717 (2d Cir. 2001).   "[T]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' . . . ."   *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40-41 (2005).   Importantly, "***activities which are merely incidental to the use of an employer-provided vehicle for commuting at the beginning and end of the***

*workday are similarly not considered part of the employee's principal activity or activities and therefore need not be compensable.*"  *Colella*, 986 F. Supp. 2d at 342-43.[15]

Given this principle of law, all of the activities of which Beecher complains are non-compensable because they are merely incidental to his commute in his TWC van:

(1)   booting computer and accessing WorkAssure;[16]

(2)   determining routing information;[17]

(3)   reading emails regarding need to go to first job or other instructions;[18]

(4)   pre-calling first customer of day;[19]

---

[15] The quoted language is taken from the Employee Commuting Flexibility Act ("ECFA"), 29 U.S.C. § 254(a), which provides that "the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee."  ECFA *clarifies* the FLSA's rules regarding payment for time employees spend commuting in employer-provided vehicles. *See Brand v. Comcast Corp.*, No. 12 CV 1122, 2015 U.S. Dist. LEXIS 130114, at *42-43 (N.D. Ill. Sept. 28, 2015).  Courts analyzing commuting time and pre-shift work claims under state law counterparts to the FLSA (such as the NYLL) have looked to the ECFA for guidance. *Id.* at 30.

[16] *See, e.g., Chambers v. Sears Roebuck & Co.*, 793 F. Supp. 2d 938, 954-55 (S.D. Tex. 2010) (time spent by technicians accessing work order addresses in morning incidental to commute and not compensable); *Brand,* 2015 U.S. Dist. LEXIS 130114, at *47 (same).

[17] *See, e.g., Rutti*, 596 F.3d at 1057 (technician's morning activities of "receiving, mapping and prioritizing jobs and routes for assignments" related to commute and thus not compensable); *Butler v. DirectSat USA, LLC*, 55 F. Supp. 3d 793, 807-09 (D. Md. 2014) (time spent prioritizing routes not compensable); *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 U.S. Dist. LEXIS 154706, 2011 WL 10069108, at *23 (W.D. Wis. Apr. 11, 2011) ("[r]eceiving and mapping routes . . . are tasks inherently related to plaintiffs' commute and not related uniquely to the activities of installing and upgrading cable services.")

[18] *See Colella,* 986 F.Supp.2d at 342-43 (communications to receive work, instructions or advice incidental and thus not compensable); *Buzek v. Pepsi Bottling Group, Inc.*, 501 F. Supp. 2d 876, 886-87 (S.D. Tex. 2007) (time spent completing end-of-day reports incidental to use of company vehicle for commute and thus not compensable); *Butler*, 55 F. Supp. 3d 793 at 807-09 (time spent reading emails regarding schedule not compensable).

[19] *See Chambers*, 793 F. Supp. 2d at 958-59 (time spent by technician calling first customer likely incidental to commute and not compensable but would, in any event, be *de minimis*).

(5)   fueling vehicle;[20]

(6)   de-icing and removing snow from vehicle;[21]

(7)   "loading" and "unloading" his laptop, cell phone and signal meter;[22] and

(8)   inspecting the vehicle prior to driving.[23]

Indeed, courts have specifically rejected claims regarding almost every one of the above

tasks.  For example, in *Colella* the Court noted:

> It is not possible to define in all circumstances what specific tasks and activities
> would be considered "incidental" to the use of an employer's vehicle for
> commuting. Communication between the employee and employer to receive
> assignments or instructions or to transmit advice on work progress or completion,
> is required in order for these programs to exist.  Likewise, routine vehicle safety
> inspections or other minor tasks have long been considered preliminary or
> postliminary activities and are therefore not compensable. Merely transporting
> tools or supplies should not change the noncompensable nature of travel.

*Id.* (emphasis added).  Thus, every pre-shift or post-shift activity about which Beecher complains

is not compensable because they are all clearly incidental to his commute.  Accordingly, TWC is

entitled to summary judgment on those theories.

---

[20] *See Chambers*, 428 F.App'x at 420 n.55 ("[R]efueling the service van, performing vehicle
safety inspections, and tidying up the van . . . are clearly incidental to the commute . . . and thus
non-compensable[.]"); *Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896, 916 (D. Minn. 2010)
("Cleaning, maintenance, and fueling of Plaintiffs' vehicles before leaving for an investigation
do not constitute principal activities or activities integral to principal activities that started the
work day.")

[21] *Smith v. Aztec Well Serv. Co.*, 462 F.3d 1274, 1291 (10th Cir. 2006) (time spent changing flat
tire, pushing vehicle out of mud, or putting chains on tires "nothing more than what commuters
would normally do if their vehicle encountered such exigencies," and are therefore preliminary
to or postliminary to plaintiff's principal activities).

[22] *See Chambers*, 793 F. Supp. 2d at 956 (loading few boxes into van incidental to commute);
*Donatti v. Charter Commc'ns,* 950 F. Supp. 2d 1038, 1053 (W.D. Mo. 2013) (carrying
equipment between company vehicle and employee's home incidental to commute).

[23] *Brand*, 2015 U.S. Dist. LEXIS 130114, at *47 (time spent performing safety inspection of
company van prior to shift incidental to commute).

2.      There Is No Evidence That TWC Knew or Should Have Known That Beecher
Performed Certain Alleged Pre-shift Work Off the Clock

Even if any of the pre-shift activities allegedly performed by Beecher were not incidental

to his commute, he would still not be entitled to compensation for those activities because there

is no evidence TWC knew or had reason to know he was allegedly performing those activities

off the clock.  *See e.g., Chambers*, 793 F. Supp. 2d at 957-58 (granting summary judgment to

employer where plaintiff technicians could not prove employer should have had knowledge of

pre-shift activities).  Indeed, the only alleged pre-shift activities of which Beecher's supervisor

was aware he might be performing was that Beecher would log into WorkAssure to obtain the

first customer location, carry his cell phone, laptop and signal meter to his van, and walk around

the vehicle to inspect it prior to beginning his commute.  (SUF ¶16.)   As shown above, courts

have consistently held that all of these activities are incidental to the commute and thus not

compensable.  Conversely, there is no evidence that Beecher's supervisor had reason to know

that he was allegedly spending time outside of his shift reading emails, reviewing work orders or

conducting an inventory of his equipment, etc.   (SUF ¶¶24-26, 29-32, 34-35, 43, 45, 52.)

Accordingly, TWC cannot be held liable for failing to pay for time spent on activities of which it

was not aware.  *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011) (actual

or constructive knowledge of off-the-clock work necessary to establish liability).

**D.      Plaintiffs' Lunch Claims Fail as a Matter of Law**

All four Plaintiffs allege that TWC failed to pay them for times they allegedly did not

receive a full 30-minute meal break.  Specifically, Plaintiffs allege that TWC automatically

deducted 30 minutes from their time each day to account for the meal break, yet Plaintiffs

sometimes did not take a full 30-minute break.  (FAC ¶46.)   As shown below, to survive

summary judgment on that claim, Plaintiffs must provide evidence of specific occasions where:

(1) they performed work activities of such significance as to render their meal period compensable; and (2) that TWC had actual or constructive knowledge of that work, yet failed to compensate Plaintiffs for same.  Plaintiffs cannot survive summary judgment, as they cannot identify any occasion where: (1) their lunch break was interrupted to such an extent as to make it compensable; (2) TWC was aware that Plaintiffs did not have a *bona fide* lunch period, yet failed to pay them; and (3) any recovery would be based on anything more than sheer speculation.

       1.    <u>Plaintiffs Cannot Identify Any Compensable Lunch Breaks</u>

As an initial matter, Plaintiffs cannot prevail on their lunch break claims merely by showing some slight interruption of their 30-minute lunches as a plaintiff is not entitled to compensation for a meal period unless he can show that he performed "activities predominantly for the benefit of the employer." *Reich v. Southern New England Telecom. Corp.*, 121 F.3d 58, 64 (2d Cir. 1997).  In fact, *Reich* rejected any requirement that employees to be completely removed from duty throughout their meal periods. *Id.* at 65; *see also Lamon v. City of Shawnee*, 972 F.2d 1145, 1155 (10th Cir. 1992) ("employee is considered to be completely relieved from duty during a meal period when the employee's time is not spent predominantly for the benefit of the employer").  "The question is not whether an employee did any work at all during his meal period, but whether that period itself is used primarily to perform activities for the employer's benefit." *Mendez v. Radec Corp.*, 232 F.R.D. 78, 82-83 (W.D.N.Y. 2005).

Here, Plaintiffs have no evidence of any occasion where, rather than mere *de minimis* interruptions, their lunch consisted of "activities predominantly for the benefit" of TWC such that the lunch period could be compensable.  (SUF ¶¶62-64, 68-69, 74-75.)

Further, given Plaintiffs' admissions that they typically took lunch breaks far longer than the 30 minutes TWC deducted from their time, it is undisputed that *TWC overpaid Plaintiffs for substantial portions of their lunches*.  Plaintiffs simply cannot show that any lunchtime work

they performed exceeded the extra 15 to 30 minutes they were already being overpaid during their long lunches.  Thus, Plaintiffs' lunch break claims fail as a matter of law.

      2.    <u>Plaintiffs Cannot Show Any Occasion Where TWC Should Have Been Aware of a Compensable Break Yet Failed to Pay for Same</u>

Importantly, automatic meal deduction policies are lawful.  *Wolman v. Catholic Health Sys. of Long Island, Inc.*, 853 F. Supp. 2d 290, 300-01 (E.D.N.Y. 2012); *Fengler v. Crouse Health Found.*, Inc., 595 F. Supp. 2d 189, 195 (N.D.N.Y. 2009) ("[T]he mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA.").  Further, employers have "no duty to ensure that employers are not working through unpaid meal breaks, and employers utilizing an automatic meal deduction policy may legally shift the burden to their employees to cancel the automatic deduction if they work through an unpaid meal break." *Wolman*, 853 F. Supp. 2d 301.

Thus, here, Plaintiffs' lunch break claim cannot survive absent evidence that TWC had knowledge that Plaintiffs were entitled to be compensated for their lunch period, yet failed to pay Plaintiffs for that time.  *Id.*  There is no such evidence.  Indeed, it is undisputed that:

- TWC's policies expressly prohibit FTs from working during meal periods.  (SUF ¶59);

- Supervisors told Plaintiffs they must comply with this policy. (SUF ¶¶58, 60);

- TWC's policy expressly provides that if an FT fails to take a full 30-minute break, he must inform his supervisor of that fact so that the supervisor can ensure they are paid for same.  (SUF ¶¶60-61.)

- ***Plaintiffs cannot identify a single instance where they informed a supervisor that they did not get a proper lunch break (or where the supervisor was otherwise aware of same), yet Plaintiffs did not get paid for that time***.  (SUF ¶¶67, 71-73.)

21

Thus, Plaintiffs' claim that TWC failed to compensate them for time spent working during their lunches fails as a matter of law on this basis, as well. *See Joza*, 2010 U.S. Dist. LEXIS 94419, at *33-34 (NYLL claim fails where employer provided procedure to report time worked, plaintiff failed to report all time allegedly worked, and no evidence that employer knew of unreported compensable time).

> 3.  Plaintiffs' Lunch Break Claim Fails Because It Is Entirely Speculative

Plaintiffs' claim for lunch breaks that were allegedly interrupted also fails because they have no evidence of damages to support those claims, but would instead attempt to speculate as to both when they worked during lunch and how much time they worked.  Notably, Plaintiffs bear the burden to establish, through credible evidence, the amount of damages for their claims. *See Brown v. Family Dollar Stores, L.P.*, 534 F.3d 593, 595 (7th Cir. 2008).  In cases where the employer's records do not detail the amount of unpaid time worked, the employee can meet his burden of showing damages by proving "that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  Under this standard, damages can "be reconstructed from memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013).

Here, while Beecher contends that he was sometimes interrupted while on lunch break, he admits that the number of times that actually happened would be a complete "guess."  (SUF ¶63.)  The other Plaintiffs similarly testified.  (SUF ¶¶68, 74, 76-77.)  Further, Beecher (and the other Plaintiffs) also admitted that they may have told supervisors on some of the occasions where their lunch breaks were interrupted and might have been paid for that time.  (SUF ¶¶67, 71-73.)  Additionally, given that Beecher and the other Plaintiffs routinely took lunch breaks

significantly longer than 30 minutes, it would be virtually impossible to determine or reconstruct any occasions where they did not at least have a *bona fide* 30-minute break.

Such allegations regarding a mere possibility of interruptions of unknown duration, on an unknown number of occasions, are insufficient to support a claim for unpaid work, as a plaintiff is not allowed to speculate as to alleged damages to defeat a motion for summary judgment. *See Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 118 (S.D.N.Y. 2009); *Millington v. Morrow Cty. Bd. of Comm'rs*, No. 2:06-cv-347, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) ("bare allegations and vague undocumented estimates" insufficient to survive summary judgment); *Joiner v. Bd. of Trs. of the Flavius J. Witham Mem'l Hosp.*, No. 1:13-cv-555-WTL-DKL, 2014 WL 3543481, at *7 (S.D. Ind. July 17, 2014) (plaintiffs' assertions that lunches were interrupted "two or three times a week" and "practically every day" are general assertions insufficient to overcome summary judgment); *Brand*, 2015 U.S. Dist. LEXIS 130114, at *74-77 (speculative claims regarding number of possible missed lunches insufficient to defeat summary judgment).  Accordingly, Plaintiffs' unpaid lunch break claims fail as a matter of law on this ground, as well.

## E.     Plaintiff's "Gap Time" Claims Fail

Count V of the FAC should be dismissed outright because Plaintiffs' claim for regular (not overtime) wages under the FLSA for time spent working during lunch periods is not legally cognizable, as the FLSA does not cover such "gap" time claims absent a showing that a plaintiff did not receive minimum wage for the alleged hours worked *each workweek.  Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013) ("So long as an employee is being paid the minimum wage or more, FLSA does not provide recourse for unpaid hours below the 40-hour threshold").  Here, even if Plaintiffs *never* took lunch breaks, they were always paid more than minimum wage for the alleged hours worked in the workweek.  (SUF ¶83.)

Further, the NYLL explicitly provides that "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled *under the provisions of this article*, he or she shall recover in a civil action the amount of any such underpayments . . . ." NYLL § 663(1) (emphasis added). "The 'article' referenced is Article 19 — the Minimum Wage Act, which provides that each employer shall pay a wage not less than the minimum wage rate set forth in NYLL § 652. The provisions of Article 19 do not specify any relief that is greater than the minimum wage." *McGlone v. Contract Callers Inc.*, No. 11-cv-3004, 2015 U.S. Dist. LEXIS 94381, *2-4 (S.D.N.Y. July 20, 2015) (analyzing *Lundy*, 711 F.3d 106. Thus, the plain language of the statute forecloses any "gap time" claim in excess of the statutory minimum wage. Here, it is undisputed that, even under the most generous calculation, TWC always paid Plaintiffs an hourly wage far in excess of the minimum wage established by New York law. (SUF ¶83.) Accordingly, it is undisputed that, to the extent Plaintiffs assert a "gap time" claim (*e.g.,* Counts I & III), it fails as a matter of law. *See McGlone*, 2015 U.S. Dist. LEXIS 94381, at *2-4.

## V.      CONCLUSION

For all of the foregoing reasons, TWC respectfully submits that its summary judgment motion should be granted in its entirety.

Dated: February 15, 2016

Respectfully submitted,

By: */s/ Nathan D. Chapman*
Nathan D. Chapman (*pro hac vice*)
Joseph W. Ozmer II (*pro hac vice*)
Kabat Chapman & Ozmer LLP
171 17th Street NW
Suite 1550
Atlanta, GA 30363
Telephone: (470) 447-0605
Facsimile: (470) 447-0615

By: */s/ M. Rogan Morton*

ATTORNEY & COUNSELOR AT LAW
21 Rugby Road, Suite 300
Buffalo, NY 14216
Telephone: (716) 432-2764
Facsimile: (716) 408-9571
rmorton@roganmortonlaw.com


*Attorneys for Defendant*
*TWC Administration LLC*