**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**STEPHEN BEECHER, Individually and on Behalf of All Others Similarly Situated,**

  **Plaintiff,**

  **vs.**

**TWC ADMINISTRATION LLC,**
**Defendant.**

**Case No. 1:15-cv-00154-WMS-JJM**


**DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL HISTORY .................................................................................. 2

III.    BACKGROUND .................................................................................................. 3

    **A.**   TWC's Compensation Policies ........................................................... 3

    **B.**   Field Technicians' Job Duties ............................................................ 4

    **C.**   TWC's Voluntary Start From Home Program ................................... 5

    **D.**   Beecher's Allegations Regarding Pre-Shift Activities ...................... 6

    **E.**   Plaintiffs Admit They Did Not Always Perform These Activities Off-the-Clock and That When They Did They Were Violating TWC Policy ..................... 7

    **F.**   Beecher Presents No Evidence Regarding Any Location Other Than Buffalo ............................................................................................... 9

    **G.**   Dozens of FTs Throughout the State Refute Beecher's Common Policy Allegations ........................................................................................ 9

IV.     ARGUMENT AND CITATION TO AUTHORITY .......................................... 12

    **A.**   Certification Must Be Denied Because The Proposed Class Is Not Ascertainable .................................................................................... 12

    **B.**   Rule 23's Requirements for Class Certification .............................. 13

    **C.**   Beecher Cannot Establish Commonality and Typicality with the Proposed Class As He Presents No Evidence of a Statewide Policy or Practice Giving Rise to Liability ..................................................................... 15

    **D.**   Individual Issues Will Predominate Over Common Ones .................. 20

        1.   Individualized Issues Would Predominate Any Determination as to Whether Each FT Performed Pre-Shift, Off-the-Clock Work. ................. 20

        2.   Individualized Issues Would Predominate Any Determination as to Whether TWC Had Knowledge of Particular FTs Performing Pre-Shift Work Off-the-Clock ................................................................................. 22

        3.   Individualized Inquiries Would Be Necessary to Determine Whether Liability Can Be Established Given That Plaintiffs Admit They Were Overcompensated for Their Commutes and Lunch Breaks. .................... 22

        4.   Individualized Issues Would Predominate Determinations as to Whether TWC's *De Minimis* Defense Applies to Particular FTs .......................... 23

    **E.**   Beecher's Proposed Class Must Fail as It Is Based on an Inherently Flawed Claim .................................................................................... 25

V.      CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adashunas v. Negley*,
  626 F.2d 600 (7th Cir. 1980) ...............................................................................13

*Albrecht v. Wackenhut Corp.*,
  No. 07-CV-6162, 2009 U.S. Dist. LEXIS 88073 (W.D.N.Y. Sept. 24, 2009) .......................23

*Alleyne v. Time Moving & Storage Inc.*,
  264 F.R.D. 41 (E.D.N.Y. 2010) ...........................................................................21

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997)........................................................................................20

*Asare v. Change Grp. of NY, Inc.*,
  No. 12 CV 3371, 2013 WL 6144764 (S.D.N.Y. Nov. 15, 2013) ...........................................19

*Brecher v. Rep. of Argentina*,
  No. 14-4385, 2015 WL 5438797 (2d Cir. Sept. 16, 2015) ...................................................12

*Charrons v. Pinnacle Group NY LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ...........................................................................12

*Colella v. City of New York*,
  986 F. Supp. 2d 320 (S.D.N.Y. 2013)......................................................................25

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013)......................................................................................20

*Cowen v. Bank United of Texas, FSB*,
  70 F.3d 937 (7th Cir. 1995) ................................................................................25

*Daniels v. City of New York*,
  198 F.R.D. 409 (S.D.N.Y. 2001) ...........................................................................13

*DeSilva v. N. Shore-Long Island Jewish Health Sys.*,
  27 F. Supp. 3d 313, 329 (E.D.N.Y. 2014) ...............................................................21, 24

*Enea v. Bloomberg, L.P.*,
  No. 12 CIV. 4656 GBD FM, 2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014) ..........................21

*Espinoza v. 953 Associates LLC*,
  280 F.R.D. 113 (S.D.N.Y. 2011) ...........................................................................17

*Fears v. Wilhelmina Model Agency, Inc.*,
   No. 02 Civ. 4911 (HB), 2003 WL 21659373 (S.D.N.Y. July 15, 2003) ................................13

*Fernandez v. Wells Fargo Bank, N.A.*,
   No. 12-CV-7193, 2013 U.S. Dist. LEXIS 124692 (S.D.N.Y. Aug. 27, 2013) ........................17

*Gen. Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (1982) ......................................................................................................14

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014) (Skretny, J.) ..............................................14, 15, 16, 19

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013) ........................................................................................13

*Iglesias-Mendoza v. La Belle Farm, Inc.*,
   239 F.R.D. 33 (S.D.N.Y. 2007) ....................................................................................19

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ...........................................................................................14

*Johnson v. Nextel Commc'ns Inc.*,
   780 F.3d 128 (2d Cir. Mar. 4, 2015) ............................................................................21

*Joza v. WW JFK LLC*,
   No. 07-CV-4153, 2010 U.S. Dist. LEXIS 94419 (E.D.N.Y. Sept. 9, 2010) ...................22, 23

*Khait v. Whirlpool Corp.*,
   No. 06-6381, 2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ...................................................19

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02-CV-7618, 2004 WL 5719589 (S.D.N.Y. Mar. 31, 2004) ...........................................20

*Laroque v. Domino's Pizza, LLC*,
   557 F. Supp. 2d 346 (E.D.N.Y. 2008) ...................................................................................17

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d. Cir. 2008) .................................................................................................25

*Mendez v. U.S. Nonwovens Corp.*,
   No. 12-CV-5583, 2016 U.S. Dist. LEXIS 5438 (E.D.N.Y. Jan. 15, 2016) ............................17

*Morris v. Alle Processing Corp.*,
   No. 08CV-4874, 2013 WL 1880919 (E.D.N.Y. May 6, 2013) ...............................................19

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2009), cert. denied, 132 S. Ct. 368 (2011) ....................................13, 17

*Perez v. G&P Auto Wash*,
  930 F. Supp. 2d 423 (E.D.N.Y. 2013) ...................................................................24

*Poplawski v. Metroplex on the Atl., LLC*,
  No. 11-CV-3765, 2012 WL 1107711 (E.D.N.Y. Apr. 2, 2012) ...............................21

*Reich v. NY City Transit Auth.*,
  45 F.3d 646 (2d Cir. 1995)......................................................................................24

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)..........................................................................14, 21, 24

*Rui Xiang Huang v. J&A Entm't Inc.*,
  2012 U.S. Dist. LEXIS 184727 (E.D.N.Y. Dec. 3, 2012) ......................................24

*Ruiz v. Citibank, N.A.*,
  93 F. Supp. 3d 279, 294 (S.D.N.Y. 2015) .........................................................14, 19

*In re Scotts*,
  304 F.R.D. (S.D.N.Y. 2015) ....................................................................................12

*Seward v. IBM*,
  No. 08-CV-3976, 2012 U.S. Dist. LEXIS 49688 (S.D.N.Y. Jan. 20, 2012) ..........17

*Singh v. City of New York*,
  524 F.3d 361 (2d Cir. 2008)....................................................................................23

*Turner v. GMAC*,
  980 F. Supp. 737 (S.D.N.Y. 1997) ..........................................................................25

*Vivaldo v. United Talmudical Acad. of Kiryas Joes, Inc.*,
  No. 14CV2636, 2015 WL 4922961 (S.D.N.Y. June 18, 2015).............................19

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011).......................................................................................14, 16

*Wal-Mart Stores, Inc. v. Dukes*,
  *31* S. Ct. 2541 (2011)..............................................................................................15

*Wright v. Schock*,
  742 F.2d 541 (9th Cir. 1984) ...................................................................................25

*Zivali v. AT&T Mobility, LLC*,
  784 F. Supp. 2d 456 (S.D.N.Y. 2011)................................................................22, 24

## I.   INTRODUCTION

Plaintiff Stephen Beecher urges the Court to certify a class of Field Technicians ("FTs") who participated in TWC's voluntary Start From Home ("SFH") program, which allowed those FTs to take a Company van home and use it for their commute, thus saving them time and money.  Beecher contends that as a matter of uniform policy and practice TWC forced those FTs to perform uncompensated "pre-shift" work related to their choice to use the Company van for their commute, and that class treatment is therefore appropriate.  Beecher falls woefully short of meeting his burden to establish that certification is proper under Rule 23.  Indeed, Beecher focuses only on the question of whether the practices he *alleges* are lawful, yet he entirely ignores the central Rule 23 inquiry into whether the putative class members even share common experiences with respect to those alleged practices in the first instance.  The record shows they did not, as *dozens* of FTs deny that they had experiences similar to those Beecher alleges.  Indeed, Beecher's bid for certification suffers from all of the following defects (and then some):

- Beecher's motion fails at the outset because the class members cannot be ascertained, as there are no records showing which FTs chose to participate in the SFH Program.

- TWC submits concurrently herewith declarations of more than 30 FTs from all over New York state who destroy Beecher's contention of any common policies or practices.

- While Beecher seeks certification of a statewide class, he fails to provide **any** evidence regarding any location other than Buffalo.

- Because TWC policy expressly forbid FTs from working off-the-clock to perform the activities of which Beecher complains, liability could be established only through individualized inquiries to determine whether an FT's supervisor had actual or constructive knowledge that the FT performed any such tasks off-the-clock.

- There are individualized defenses applicable to each class member, as evidenced by Beecher's and his three co-plaintiffs' admissions that they often were over-compensated when they took 45 to 60 minute lunches, commuted on the clock, and even sat at home on the clock, all in violation of TWC policy.  Thus, even assuming an FT performed some compensable work off-the-clock, an individualized analysis would be required for each FT to determine whether any such time exceeded the non-compensable time for which the FT was over-compensated during the workweek.

- Even if it was feasible to determine which specific pre-shift activities each FT performed and whether the FT's supervisor knew those activities were performed off-the-clock, a highly-individualized fact inquiry would be required to resolve TWC's *de minimis* defense, as dozens of FTs state that the only thing they do prior to their shifts is check the location of their first job – a task they state takes only almost no time.

- Finally, even if Beecher could surmount the aforementioned hurdles, class certification should still be denied because his theory of liability is patently flawed, as settled law holds that all of the activities Beecher alleges that FTs performed off-the-clock were merely incidental to their commute and, therefore, not compensable under the NYLL.

These defects, and others shown below, are fatal to Beecher's motion, as they make clear that resolving liability as to each FT would require a highly individualized inquiry from start to finish.  As such, Beecher cannot meet his burden to prove the requirements of Rule 23, including (*inter alia*) ascertainability, commonality, typicality and predominance.  Accordingly, as discussed more fully below, Plaintiffs' motion for class certification should be denied.

## II.   PROCEDURAL HISTORY

Beecher filed this putative class and collective action case on February 17, 2015.  [DE 1.]

On October 27, 2015, Beecher and three other former FTs also from Buffalo--Dueringer, Reeves, and Wilson--filed an Amended Complaint containing two (2) claims brought on a putative class action basis by Beecher alone, and four (4) other claims brought by all Plaintiffs on an individual basis.  [DE 42.]  Beecher is the sole named, representative with regard to the class claims.

Beecher filed his motion for class certification ("Motion") on January 8, 2016.  [DE 44.]  In that motion, Beecher asks the Court to certify a class of all FTs in New York who participated in the SFH program at any time from February 17, 2009 to the present.  [DE 44-1 at 2.]

## III.   BACKGROUND[1]

### A.   TWC's Compensation Policies

FTs in New York are non-exempt employees paid on an hourly basis, including overtime for all hours worked over 40 in a workweek.[2]  TWC's timekeeping policies prohibit non-exempt employees from performing any work when they are not clocked in.[3]  For example, TWC's policy expressly prohibits non-exempt employees from reviewing work-related emails or voicemails when they are not clocked in.[4]  FTs are told during training, and reminded by their supervisors, to ensure they do not perform any work off the clock and to notify their supervisors if any edits need to be made to their punches to make sure they are paid for all time worked.[5]

---

[1] Plaintiffs' Declarations cited herein were previously filed into the record by Plaintiffs.  (*See* DE 44-18 ("Beecher Dec."); 44-21 ("Dueringer Dec."); 44-22 ("Reeves Dec."); and 44-23 ("Wilson Dec.").)   Defendant submits all other supporting record evidence herewith.   Supporting declarations from FTs are submitted, in alphabetical order, as a collective exhibit.

[2] Ciliberti Dec. ¶6; Dueringer Dep. 209:24-10:7; Reeves Dep. 359:13-60:7; Wilson Dep. 27:5-8.

[3] Ciliberti Dec. ¶8; Crowley Dec. ¶4.

[4] Ciliberti Dec. ¶10 & Exh. 1; Crowley Dec. ¶19.

[5] *See* Ciliberti Dec. ¶8; Crowley Dec. ¶4; *see also* Reeves Dep. 42:5-15; Wilson Dep. 42:21-43:4; Bachanas Dec. ¶3; Belanger Dec. ¶3; Collins Dec. ¶3; Driessler Dec. ¶3; Gaston Dec. ¶3; Graham Dec. ¶3; Gaffney Dec. ¶3; Gomez Dec. ¶3; Hart Dec. ¶3; Healy Dec. ¶3; Johnson Dec. ¶3; Korbel Dec. ¶3; Lafex Dec. ¶3; Lempicki Dec. ¶3; Lyman Dec. ¶3; Merkley Dec. ¶3; Quinn

TWC policy also requires FTs to review their time punches for each pay period and either approve those punches or notify their supervisors of any discrepancies so that TWC can make sure they are paid for all time worked.[6]

## B.    Field Technicians' Job Duties

Most FTs' job duties require them to install, troubleshoot, repair, and disconnect TWC's services at customer residences, which requires those FTs to travel to customer locations to perform their jobs.[7]   Some FTs, however, are not generally assigned work orders and instead perform other duties such as assisting on difficult jobs, handling customer complaints, and performing administrative tasks.[8]   FTs who are assigned work orders are generally notified of their jobs, including the customer address where the work is to be performed, via a software program called "WorkAssure" or "I&R."[9]   While FTs previously accessed this program through their Company-issued laptops, they currently do so through Company-supplied iPads.[10] Depending on the location where they work, some FTs also use the WorkAssure program to clock in and out, while others will dial a number on their cell phones to clock in and out.[11]   TWC provides FTs with service vans equipped with tools, parts and other items necessary for them to

---

Dec. ¶3; Ryan Dec. ¶3; Scott Dec. ¶3; Thomas Dec. ¶4; Vazquez Dec. ¶3; Villa Dec. ¶3; Wampler Dec. ¶4; White Dec. ¶3; Wilson Dec. ¶3.

[6] Ciliberti Dec. ¶8; *see also* Reeves Dep. 294:6-295:4; Wilson Dep. 40:10-20; Grant Dec. ¶3 (reviews and approves timecards each pay period and every time he has notified supervisor of discrepancy, he has been paid for that time); Hart Dec. ¶3 (same); Lempicki Dec. ¶3 (same).

[7] *See, e.g.,* Bachanas Dec. ¶3.

[8] *See, e.g.,* Hart Dec. ¶8; Vazquez Dec. ¶¶5, 7; White Dec. ¶¶6, 9.

[9] Gomez Dec. ¶7; Lempicki Dec. ¶7.

[10] Bachanas Dec. ¶7; Belanger Dec. ¶8; Driessler Dec. ¶7; Gaston Dec. ¶7; Graham Dec. ¶7; Gomez ¶7; Healy Dec. ¶7; Johnson Dec. ¶7; Korbel Dec. ¶7; Lempicki Dec. ¶7; Lyman Dec. ¶7; Quinn Dec. ¶7; Scott Dec. ¶7.

[11] Graham Dec. ¶8 (clocks in via cell phone); Lempicki Dec. ¶7 (same); Lafex Dec. ¶3 (clocks in via WorkAssure); Merkley Dec. ¶3 (used phone initially to clock in but now uses WorkAssure).

carry out their job responsibilities.[12]

## C.     TWC's Voluntary Start From Home Program

Since approximately 2009, FTs in New York have been given the option to participate in

TWC's Start-From-Home program.[13]  FTs participating in the program drive the TWC van home

at the end of the day instead of returning it to a TWC facility, and then to use the van to commute

from home directly to his or her assigned work area the next workday.[14]

The terms of the SFH program are set forth in various written documents depending on

the timeframe.[15]  Notably, the Northeast Technical Operations Work-From-Home Policy states

that "**[n]o work is to be done by technicians prior to arrival at the customer location and

logging into work to start the day**."[16]  Thus, the *only* activity that FTs who chose to take their

TWC van home with them were allowed to do prior to clocking in each morning was logging

into the WorkAssure program to look at the address for their first job location[17] – a task that is

merely incidental to their commute to that location, as a matter of settled law.[18]

The SFH program is voluntary.[19]  TWC does not keep historical records of which FTs

---

[12] Hart Dec. ¶4; Lyman Dec. ¶4.

[13] Connor Dec. ¶3.

[14] *Id.*

[15] Crowley Dec. ¶¶6-7 & Exhs. 1-3 thereto.

[16] Exh. 2 to Crowley Dec.  That SFH policy further provides that only valuable equipment, such as meters and laptops, need be taken into the FT's home at the end of the day.  *Id.* at ¶12.  The policy also provides that weekly vehicle inspections, washing, cleaning and organizing must be performed during the employee's shift.  *Id.* at ¶18.  The SFH policy also makes clear that FTs should not pre-call any customers prior to clocking in.  Exh. 3 to Crowley Dec. ¶9.

[17] Crowley Dec. ¶8.

[18] *See* Section IV(C), *infra*.

[19] Connor Dec. ¶3.

have participated in the SFH program.[20]   Additionally, because FTs can (and often do) move in and out of the program, there is also no way to determine what dates a particular FT participated in the program without asking that individual.[21]   Beecher, Dueringer, Reeves and Wilson all admit they *chose* to participate in the SFH program and that doing so saved them time and money since they did not need to use their personal vehicles to commute to a TWC facility to retrieve their van.[22]   FTs universally view the SFH program as a perk of their employment.[23]

**D.    Beecher's Allegations Regarding Pre-Shift Activities**

Beecher seeks class certification based on allegations that FTs who chose to participate in the SFH program were uniformly required to perform various work activities before clocking in for their shifts.   Specifically, Beecher alleges in his Motion (or supporting material) that he performed the following activities off-the-clock:

- Boot up his laptop and access WorkAssure to analyze his work orders for the day;

- Inventory his van to ensure he had the equipment he needed for his jobs and Arranging to pick-up any equipment he needed for the day;[24]

- Determined the "routing" of his jobs;

---

[20] *Id.* ¶¶5-8.

[21] Connor Dec. ¶8.

[22] Beecher Dep. 28:19-29:9; Dueringer Dep. 52:17-53:6; Reeves Dep. 24:6-17; Wilson Dep. 32:20-33:13.

[23] *See* Bachanas Dec. ¶5; Belanger Dec. ¶5; Coccia Dec. ¶4; Collins Dec. ¶6; Driessler Dec. ¶6; Gaston Dec. ¶5; Graham Dec. ¶5; Gomez Dec. ¶6; Grant Dec. ¶6; Hart Dec. ¶6; Healy Dec. ¶5; Johnson Dec. ¶5; Korbel Dec. ¶5; Lafex Dec. ¶7; Lempicki Dec. ¶5; Lyman Dec. ¶5; Merkley Dec. ¶7; Roman Dec. ¶4; Scott Dec. ¶5; Thomas Dec. ¶5; Vasquez Dec. ¶6; Villa Dec. ¶6; White Dec. ¶5;Wilson Dec. ¶5; *see also* Gaffney Dec. ¶5 ("The benefits of this [SFH] program are substantial . . . ."); Quinn Dec. ¶5 ("It is a huge benefit to me to be able to take the van home.").

[24] Notably, however, Beecher admits he was never told by a supervisor to analyze work orders or conduct any sort of inventory prior to clocking in.   Beecher Dep. 218:20-223:10; *see also* Dueringer Dep. 118:10-19:9 (same).

- Reviewed emails or other work communications;

- Performed a safety inspection by walking around his vehicle;

- Cleared snow and ice from his vehicle;

- Loaded the Company van with equipment; and

- Fueled the Company van. [25]

(*See generally* Motion & Beecher Dec.)

### E.    Plaintiffs Admit They Did Not Always Perform These Activities Off-the-Clock and That When They Did They Were Violating TWC Policy

Beecher admits that performing most of these activities off-the-clock was in direct violation of TWC's aforementioned policies.   For example, there is no dispute that all of the following violate TWC policy:

- Analyzing work orders and inventorying van off-the-clock;[26]

- Reading emails or other work communications while off the clock;[27]

- Fueling the Company vehicle off-the-clock.[28]

---

[25] Plaintiffs' declarations also assert that they *sometimes* pre-called customers prior to clocking in.  (*See, e.g.,* Beecher Dec. ¶16.)  Beecher does not, however, discuss that activity in his motion for class certification.  To the extent Beecher asserts that FTs commonly performed this activity off the clock, he is wrong.  *See* Crowley Dec. ¶13 (instructs FTs not to pre-call first customer); Elwell Dec. ¶7 (only pre-called customers when clocked in); Gaston Dec. ¶11 (same); Healy Dec. ¶12 (same); Korbel Dec. ¶14 (same); Lyman Dec. ¶13 (same); Scott Dec. ¶13 (same); Thomas Dec. ¶8 (same); Wampler Dec. ¶9 (same); White Dec. ¶14 (did not typically pre-call); Lempicki Dec. ¶14 (typically did not pre-call first customer); Beecher Dep. 278:21-79:2 (admitting there was no policy requiring pre-calls), 274:2-77:10 (admitting he often did not pre-call first customer); Dueringer Dep. 108:2-10 (did not know whether he was typically on or off clock during pre-calls); Reeves Dep. 161:19-62:11 (admits that TWC may not have required pre-calls to first customer).

[26] Beecher Dep. 226:16-28:22; Ciliberti Dec. ¶8.

[27]  Ciliberti Dec. ¶¶8, 10 & Exh. 1; Crowley Dec. ¶19; Beecher Dep. 162:5-64:19, 285:25-86:8, 286:9-17; Connor Dep. 191:9-22.

[28] Ciliberti Dec. ¶10 & Exh. 1; Crowley Dec. ¶10; Beecher Dep. 164:21-65:2; *see also* Connor Dep. 190:19-91:8.

Moreover, Beecher's assertion that there was any common policy or practice requiring these activities to be performed off-the-clock (if at all), is undermined his own testimony and that of his three co-plaintiffs, as they all admit that even they did not consistently perform many of these pre-shift activities at all, much less off-the-clock.[29]  For example:

- Dueringer began making arrangements to pick up equipment only after clocking in;[30]

- Dueringer could not recall ever fueling the vehicle off-the-clock,[31] and Reeves' Declaration does not contend that he ever fueled his vehicle off-the-clock;

- Plaintiffs admit they generally knew what equipment was on their van and that they thus did not conduct an inventory every day;[32]

- Beecher, as well as his co-plaintiffs, all admit they spent no extra time "loading" equipment, as the only equipment they needed to "load" was their laptop, cell phone and a signal meter the size of a small tissue box, all of which they simply carried with them when they walked out to the van in the morning;[33] and

- Beecher admitted that determining "routing" was not a common occurrence, as he was

---

[29] Notably, while Beecher contends the SFH policy itself required all of the alleged pre-shift activities to be performed off the clock, the only "evidence" cited in support of those contentions are the Plaintiffs' own self-serving testimony.  (*See* Motion at 5-7 & n.15-21.)  As shown herein, TWC's policies specifically prohibit FTs from working off the clock.  Further, *dozens* of FTs swear that they followed TWC policy and did not perform the alleged pre-shift activities off the clock (if at all).

[30] Dueringer Dep. 87:17-88:23; 94:3-95:13; 128:14-30:3.

[31] Dueringer Dep. 132:7-23.

[32] Beecher Dep. 291:24-92:14; 246:6-47:14; Dueringer Dep. 92:14-25; 112:9-24, 117:23-18:8; *see also* Connor Dep. 144:9-22 (FTs should know equipment levels in trucks since they work in vehicles throughout day).  Indeed, when asked why he would do an inventory in the morning since he already knew the equipment levels from the previous day, Beecher said it was to "refresh" his memory.  Beecher Dep. 291:24-92:14.

[33] Beecher Dep. 36:10-23, 38:2-7, 258:7-11; Reeves Dep. 46:1-47:10; Wilson Dep. 125:8-17.

normally routed in the same area and thus knew how to get to a given address.[34]

In short, Plaintiffs' own experiences show there was no common policy or practice requiring FTs to work off the clock to perform the activities of which Beecher complains, as even Plaintiffs did not consistently perform such activities at all, much less off-the-clock.

## F. Beecher Presents No Evidence Regarding Any Location Other Than Buffalo

Notably, while Beecher seeks certifications of a statewide class, *he provides no evidence whatsoever regarding any of TWC's operations other than its Buffalo location*. Further, even with respect to Buffalo, Beecher's allegations are limited to the self-serving and inconsistent testimony of himself and his three co-plaintiffs. As shown below, that testimony is soundly refuted not only by other FTs at the Buffalo location, but by FTs throughout the state.

## G. Dozens of FTs Throughout the State Refute Beecher's Common Policy Allegations

Beecher's contention that FTs were required, as a matter of common policy or practice, to perform the above activities off-the-clock is belied by the declarations of *dozens* of FTs throughout the state who swear that: (1) they never performed those activities off-the-clock nor did their supervisors ever suggest such activities could or should be performed off the clock; and (2) these activities took only moments to perform and were simply incidental to their commuting in a Company vehicle. Indeed, as shown by the dozens of declarations TWC has filed herewith:

- Many FTs participating in the SFH Program do not receive work orders and thus do not log into WorkAssure to view their first job before leaving the house;[35]

- Those FTs who do receive work orders merely access WorkAssure to determine the location of their first job of the day so that they know where to commute to – a

---

[34] Beecher Dep. 26:24-27:13.

[35] *See, e.g.,* Hart Dec. ¶ 8; Vazquez Dec. ¶¶ 5, 7; White Dec. ¶¶ 6, 9.

process that took only a few minutes with their laptops[36] and now typically takes less

than a minute on the Ipad; [37]

- Those FTs who do look up their first job location in WorkAssure prior to the start of

  their shift do not perform any other work activities prior to clocking in; [38]

- FTs do not analyze their work order or inventory equipment prior to clocking in,[39]

  nor do they arrange to pick-up needed equipment when they are not clocked in;[40]

---

[36] Bachanas Dec. ¶8 (5 minutes or less); Belanger Dec. ¶9 (same); Driessler Dec. ¶7 (same); Gaston Dec. ¶6(same); Graham Dec. ¶8 (same); Healy Dec. ¶8 (same); Gomez Dec. ¶7 (less than 3 minutes); Edinger Dec. ¶5 (1 minute); Hart Dec. ¶7 (1 minute); Korbel Dec. ¶9 (couple of minutes); Lafex Dec. ¶8 (3-4 minutes); Lyman Dec. ¶8 (few minutes); Merkley Dec. ¶8 (less than 2 minutes); Scott Dec. ¶8 (few minutes); Villa Dec. ¶7 (less than 5 minutes).

[37] Bachanas Dec. ¶8 (couple of minutes); Belanger Dec. ¶9 (less than one minute); Collins Dec. ¶7 (30 seconds); Edinger Dec. ¶5 (5-10 seconds); Gaston Dec. ¶6 (few seconds); Graham Dec. ¶8 (2 minutes); Gomez Dec. ¶7 (less than 2 minutes); Hart Dec. ¶7 (less than a minute); Healy Dec. ¶8 (less than 2 minutes); Johnson Dec. ¶9 (10-15 seconds); Korbel Dec. ¶9 (few seconds); Lafex Dec. ¶8 (less than one minute); Lempicki Dec. ¶9 (less than 2 minutes); Lyman Dec. ¶8 (less than 5 minutes); Quinn Dec. ¶7 (no more than 1 minute); Scott Dec. ¶8 (one minute or less); Villa Dec. ¶7 (instantaneous); White Dec. ¶7 (less than 1 minute).

[38] Grant Dec. ¶7 (spends no time planning out his route because WorkAssure sets out the order of his jobs); Lafex Dec. ¶9 (same); Merkley Dec. ¶9 (same); Vazquez Dec. ¶9 (same); Villa Dec. ¶9 (same).

[39] Bachanas Dec. ¶10; Belanger Dec. ¶10; Coccia Dec. ¶10; Driessler Dec. ¶8; Edinger Dec. ¶8; Elwell Dec. ¶8; Gaston Dec. ¶8; Graham Dec. ¶10; Gaffney Dec. ¶7; Gomez Dec. ¶9; Grant Dec. ¶¶7, 9; Hart Dec. ¶9; Healy Dec. ¶10; Johnson Dec. ¶11; Korbel Dec. ¶11; Lafex Dec. ¶¶9-10; Lempicki Dec. ¶11; Lyman Dec. ¶10; Merkley Dec. ¶¶9-10; Quinn Dec. ¶11; Roman Dec. ¶7; Ryan Dec. ¶8; Sanders Dec. ¶7; Scott Dec. ¶10; Thomas Dec. ¶7; Vazquez Dec. ¶¶9-10; Villa Dec. ¶¶9-10; Wampler Dec. ¶7; White Dec. ¶8; Wilson Dec. ¶8; *see also* Connor Dep. 143:7-23 (stating that FTs should not be checking inventory until clocked in). Moreover, FTs have weekly "meeting" days at their facility to restock their vans while on the clock -- a process designed to ensure that FTs have everything they need until the next weekly "meeting" day. *See* Dueringer Dep. 93:3-13; Graham Dec. ¶6; Lyman Dec. ¶6; Reeves Dep. 145:14-146:13; Driessler Dec. ¶9 (believes TWC's system of weekly restocking van is foolproof and generally supplies him with everything he needs during the week).

[40] Thus, Beecher's argument that TWC "acknowledges" FTs have to review their work orders and ensure they have the necessary equipment prior to the start of their shifts is a blatant misrepresentation of the record. (Plf Motion at 9). Rather, TWC's 30(b)(6) witness made clear that FTs should not be checking their equipment prior to clocking in and, instead, should wait

- If an FT finds that he or she is missing equipment necessary to complete a job, he or she is supposed to call a lead technician or supervisor *while on the clock* to make arrangements to get the equipment;[41]

- FTs do not spend any time determining "routing" for their jobs, as this is automatically done by WorkAssure and the FTs know their assigned work areas;

- FTs do not review emails or other work communications prior to clocking in;[42]

- Some FTs do not inspect their vehicles at all,[43] and those who do confirm that it takes only moments to walk around the van once to ensure it is safe to drive;[44]

- FTs acknowledge that they would have to remove snow and ice from their vehicle

---

until they are at the customer location and have begun their shifts before verifying they have the necessary equipment for the job.  Connor Dep. 143:7-145:15.

[41] Crowley Dec. ¶18; Bachanas Dec. ¶10; Belanger Dec. ¶10; Coccia Dec. ¶10; Collins Dec. ¶10; Driessler Dec. ¶10; Edinger Dec. ¶8; Gaston Dec. ¶8; Gomez Dec. ¶12; Grant Dec. ¶10; Hart Dec. ¶11; Healy Dec. ¶10; Johnson Dec. ¶11; Korbel Dec. ¶11; Lafex Dec. ¶10; Lyman Dec. ¶10; Merkley Dec. ¶10; Roman Dec. ¶7; Ryan Dec. ¶8; Sanders Dec. ¶7; Scott Dec. ¶10; Thomas Dec. ¶7; Vazquez Dec. ¶10; Villa Dec. ¶10; Wampler Dec. ¶7; White Dec. ¶8.

[42] Bachanas Dec. ¶3; Healy Dec. ¶3; Johnson Dec. ¶3; Belanger Dec. ¶9 (specifically told not to look at anything other than where first job is prior to start of shift); Coccia Dec. ¶7; Driessler Dec. ¶¶13-14; Graham Dec. ¶3; Gaffney Dec. ¶8; Gomez Dec. ¶14; Hart Dec. ¶13; Lafex Dec. ¶12; Lyman Dec. ¶3; Scott Dec. ¶3; Edinger Dec. ¶5; Elwell Dec. ¶5; Gaston Dec. ¶3; Grant Dec. ¶13; Thomas Dec. ¶9; Wampler Dec. ¶10; Merkley Dec. ¶13; Roman Dec. ¶8; Ryan Dec. ¶10; Korbel Dec. ¶3; Sanders Dec. ¶8; Vazquez Dec. ¶13; Villa Dec. ¶13; White Dec. ¶13. Thus, Beecher's claim that TWC "acknowledges" requiring FTs to review and make work-related communications prior to their shifts is completely unsupported by the record.  (Motion at 9.)  Rather, the cited testimony from TWC's 30(b)(6) witness merely states that FTs are expected to monitor communications regarding outages – not that they are expected to do so during uncompensated time.  (*See* Connor Dep. 168:20-70:1.)

[43] Driessler Dec. ¶15; Graham Dec. ¶11; Vazquez Dec. ¶11.

[44] Bachanas Dec. ¶11; Belanger Dec. ¶11; Gaston Dec. ¶9; Gaffney Dec. ¶9; Gomez Dec. ¶9; Healy Dec. ¶11; Johnson Dec. ¶12; Korbel Dec. ¶12; Lafex Dec. ¶11; Lempicki Dec. ¶12; Lyman Dec. ¶11; Merkley Dec. ¶11; Quinn Dec. ¶12; Scott Dec. ¶11; Villa Dec. ¶11; White Dec. ¶10; Wilson Dec. ¶9.

regardless of whether they drove the Company van or their own vehicle;[45]

- FTs do not spend any extra time loading their vehicles, as they simply carried their laptop (or Ipad), signal meter and phone with them on their way to the van;[46] and

- FTs do not fuel their Company vehicles off-the-clock.[47]

Accordingly, the record destroys Beecher's contention that FTs even performed compensable off-the-clock work prior to their shift, much less that there was any common policy or practice requiring or even permitting such off-the-clock work.

## IV.   ARGUMENT AND CITATION TO AUTHORITY

### A.   Certification Must Be Denied Because The Proposed Class Is Not Ascertainable

The "Second Circuit has recognized a . . . pre-condition to class certification . . . of ascertainability." *In re Scotts*, 304 F.R.D. at 407 (S.D.N.Y. 2015); *see also Brecher v. Rep. of Argentina*, No. 14-4385, 2015 WL 5438797, at *2 (2d Cir. Sept. 16, 2015).  For a class to be ascertainable, the class definition must, first, be based on "objective criteria" and, second, it must be "administratively feasible" to identify class members without conducting a "mini-hearing on the merits of each case." *Charrons v. Pinnacle Group NY LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010).  Ultimately, class membership must be readily identifiable such that a court can determine who is in the class and bound by its ruling without engaging in numerous fact-intensive inquiries.

---

[45] Wilson Dep.  85:16-86:6 (admitting would have to clean snow and ice off of personal vehicle if using one for commute); Beecher Dep. 252:4-24 (same); Belanger Dec. ¶11 (same).

[46] Bachanas Dec. ¶12; Bellanger Dec. ¶14; Collins Dec. ¶15; Driessler Dec. ¶12; Gaston Dec. ¶12; Graham Dec. ¶13; Gaffney Dec. ¶11; Gomez Dec. ¶16; Grant Dec. ¶15; Hart Dec. ¶15; Healy Dec. ¶13; Johnson Dec. ¶14; Korbel Dec. ¶15; Lafex Dec. ¶14; Lempicki Dec. ¶15.

[47] Collins Dec. ¶11; Driessler Dec. ¶16; Edinger Dec. ¶9; Gomez Dec. ¶13; Grant Dec. ¶11; Hart Dec. ¶12; Roman Dec. ¶8; Villa Dec. ¶11; Wampler Dec. ¶11. Thus, Beecher blatantly misrepresents the record when he asserts that TWC "acknowledges" that time spent fueling the vehicles is uncompensated.  (Motion at 9.)  Rather, TWC's 30(b)(6) representative made clear that FTs should inform their supervisors if they fuel up before their shifts begin so that they are compensated for that time.  (Connor Dep. 190:19-91:8.)

*Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (HB), 2003 WL 21659373, at *2 (S.D.N.Y. July 15, 2003); *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001).

Here, Beecher cannot show that his proposed class is ascertainable. Beecher seeks to certify a class of all FTs employed in New York and who participated in the SFH program at any point in time from February 17, 2009 to the present. (Motion at 2.) As shown above, however, not all FTs participate in the SFH program, and TWC does not keep historical records identifying which FTs participated and, if so, when. Thus, it is not "administratively feasible" to identify the proposed class members. Instead, every FT who was employed in New York at any point in time for the last seven years would have to be asked if he or she participated in the SFH program (and when). The need for such individualized determinations of class membership renders the class unascertainable and warrants denial of Beecher's motion. *See Adashunas v. Negley*, 626 F.2d 600, 603-04 (7th Cir. 1980) (where identification of class members is a "gargantuan task," class is not ascertainable); *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355-56 (3d Cir. 2013) (class not ascertainable where defendant's records identify potential universe of class members but individualized fact-finding necessary to identify actual class members).

## B.      Rule 23's Requirements for Class Certification

In addition to showing that the proposed class is ascertainable, "[t]he party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2009), cert. denied, 132 S. Ct. 368 (2011). Pursuant to Rule 23(a), a class action is appropriate only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition to meeting the requirements of Rule

23(a), to certify a class pursuant to Rule 23(b)(3), Beecher must establish that "both (1) 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)).

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982)). "A district judge must assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). This analysis may overlap with the merits of the underlying claims. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

Beecher argues that, despite the clear and demanding standards set forth above, the Court should simply rubber-stamp his motion for certification, citing a few district court decisions for the proposition that "wage and hour claims for unpaid wages are about the most perfect questions for class treatment." (Motion at 12 (citing cases).) Contrary to Beecher's contention, and as amply demonstrated by the case law cited herein, courts in this Circuit *routinely* deny certification of wage and hour lawsuits, especially those alleging off-the-clock work, as Beecher's does here. *See Ruiz v. Citibank, N.A.,* 93 F. Supp. 3d 279, 294 (S.D.N.Y. 2015) (citing cases) ("a review of the case law confirms that . . . 'misclassification' cases are far more susceptible of classwide resolution than 'off-the-clock' cases"); *Gordon v. Kaleida Health*, 299 F.R.D. 380 (W.D.N.Y. 2014) (Skretny, J.) (denying motion for class certification based on

alleged violations of NYLL).   Indeed, Beecher focuses only on the question of whether the practices he *alleges* are lawful, yet he entirely ignores the central Rule 23 inquiry:   did the putative class share common experiences with respect to those alleged practices?   As shown above, they did not.   Thus, similar to the other cases in this Circuit denying certification of NYLL claims, Beecher fails to carry his burden here and certification should be denied.

**C.**   **Beecher Cannot Establish Commonality and Typicality with the Proposed Class As He Presents No Evidence of a Statewide Policy or Practice Giving Rise to Liability**

"What really matters to class certification . . . is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."   *Wal-Mart Stores, Inc. v. Dukes*, *31* S. Ct. 2541, 2551 (2011). Therefore, in order for there to be a legitimate "cause to believe that all [of a proposed class's] claims can productively be litigated at once," not only must those claims depend on a common contention, but that "common contention . . . must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."   *Id.*

Judge Skretny's decision in *Gordon v. Kaleida Health*, 299 F.R.D. 380 (W.D.N.Y. 2014) provides useful guidance.   In *Gordon*, the Court was asked to certify a class of hospital workers based on the plaintiffs' contention that the employer failed to pay for all time worked in violation of the NYLL.   The Court first noted that there was no evidence of an official "system-wide" policy requiring off-the-clock work.   *Id.* at 402-03.   Rather, the only system-wide policy required, as TWC's does here, that employees be paid for all time worked.   *Id.*   In the absence of an official policy, the plaintiffs could only establish commonality by presenting significant evidence of a *de facto,* unwritten policy that required uncompensated work.   *Id.*   Because the evidence showed that putative class members' experiences "r[a]n the gamut," the Court

determined that the plaintiffs could not show a common, *de facto* policy applied to the class and, therefore, class certification was denied due to lack of commonality. *Id.* at 402-04.

Here, Beecher claims that commonality and typicality are established because "the overarching issue that will drive the class-wide litigation is whether TWC policy denied the [SFH] Field Techs all regular and overtime in violation of NYLL for work performed prior to the start of [their] paid workday." (Motion at 14.)   Beecher's asserted question fails to identify a proper common question as a matter of law.   That is, whether putative class members performed compensable work prior to starting their workday, and whether TWC failed to pay overtime and regular wages in violation of the NYLL are no doubt important considerations in this case, but "they are not common one[s]." *Dukes*, 131 S. Ct. at 2551.   "Quite obviously, the mere claim by employees of the same company that they have suffered [a similar injury] gives no cause to believe that all their claims can productively be litigated at once." *Id.*   Indeed, if the purported common question Beecher posed was sufficient to satisfy Rule 23's commonality requirement, it would render commonality the sort of "mere pleading standard" specifically rejected by *Dukes*. Beecher's alleged common question does not satisfy *Dukes* because Beecher cannot show that the contention is capable of being resolved on a classwide basis, as shown below.

As an initial matter, TWC's timekeeping policies are facially valid – they require FTs to record all time worked. *See* Section III(A), *supra*.   Thus, to establish commonality, Beecher would have to present evidence showing that TWC had a *de facto*, statewide practice requiring FTs to perform uncompensated pre-shift work.   That, he cannot do for various reasons.

First, Beecher and his co-Plaintiffs themselves admit that they did not always perform the pre-shift activities they claim were required of all FTs prior to their shifts. *See* Section III(D), *supra*.   Obviously, there was no common policy requiring such activities to be performed off-

the-clock (if at all) if Plaintiffs themselves neglected to consistently perform them.  *See Mendez v. U.S. Nonwovens Corp.*, No. 12-CV-5583, 2016 U.S. Dist. LEXIS 5438, *40 (E.D.N.Y. Jan. 15, 2016) (inconsistencies in plaintiffs' testimony "suggest that there was no de facto or informal policy" to deny overtime); *Seward v. IBM*, No. 08-CV-3976, 2012 U.S. Dist. LEXIS 49688, at *42-52 (S.D.N.Y. Jan. 20, 2012) (detailing, in context of decertifying FLSA class, inconsistencies in plaintiffs' testimony as to whether pre-shift work was commonly required).

Second, Beecher's reliance on testimony from himself and his three co-Plaintiffs, none of whom worked for TWC outside of Buffalo, cannot possibly establish the existence of a *de facto statewide* policy.  Plaintiffs admit that they have no knowledge regarding what FTs in other locations in New York were allegedly required to do prior to their shifts.[48]  Beecher's failure to submit evidence regarding FTs' experiences in other locations dooms his bid for statewide certification.[49]  *See Espinoza v. 953 Associates LLC*, 280 F.R.D. 113, 126 (S.D.N.Y. 2011) (declining to certify class including location where plaintiffs did not work because plaintiffs had no knowledge regarding alleged practices at other location);  *Myers v. Hertz Corp.*, 624 F.3d 537, 550 (2d Cir. 2010) (commonality not shown where plaintiff presented only vague evidence regarding unlawful pay practices at other locations); *Fernandez v. Wells Fargo Bank, N.A.,*  No. 12-CV-7193, 2013 U.S. Dist. LEXIS 124692, at *18-19 (S.D.N.Y. Aug. 27, 2013) (submission of branch-specific evidence insufficient to establish common, class-wide policy); *Laroque v.*

---

[48] *See* Beecher Dep. 26:4-6; Reeves Dep. 370:5-9 ("Q:  Other technicians, if we want to know what their routines are, we've got to ask them, right? . . . A:  Absolutely."); Wilson Dep. 139:14-140:6.)

[49] Beecher argues that TWC "acknowledges" FTs in New York were not paid for certain tasks through reliance on TWC's 30(b)(6) testimony.  (Motion at 8-9.)  As discussed above, however, Beecher completely misrepresents that testimony.  The *only* alleged pre-shift activity that TWC has "acknowledged" was not paid is that those FTs who were assigned work orders would access WorkAssure from home prior to commuting to their first job.  Such activities are, as discussed below and in TWC's motion for summary judgment, incidental to the commute and therefore not compensable.

*Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (denying certification of class including employees at locations other than plaintiffs' location based on lack of evidence that unlawful policy extended beyond store where plaintiffs worked).

Third, Beecher cannot establish a *de facto* statewide policy requiring FTs to perform uncompensated, pre-shift work because *dozens* of FTs in multiple locations across New York deny they were subject to any such common policy or practice:

- Some FTs in the SFH program do not access WorkAssure prior to their shifts.

- FTs who do look at WorkAssure prior to their shifts do so only to determine the address of their first assigned job, a process that takes only a few seconds or minutes.

- FTs do not analyze work orders or identify equipment needed to complete their jobs prior to their shifts.

- FTs are not required to review equipment inventory prior to their shifts.

- FTs spend no additional time carrying a laptop/iPad, phone and signal meter into their vans in the morning.

- FTs do not review or respond to work-related communications prior to their shifts.

- Many FTs do not perform any type of vehicle check prior to their shifts.  Those that do simply walk around the vehicle to insure it is safe to drive, a common-sense practice that takes virtually no time.

- FTs do not have to "route" their jobs, as WorkAssure does that for them automatically.  Any time spent inputting an address into a GPS unit on rare occasions where the FT does not already know where to go (if it was not automatically populated) would be minimal.

Indeed, testimony from one FT in the Rochester area sums up the differences between Plaintiffs'

alleged experiences and those of dozens of other FTs in the putative class: "In my opinion, one of the perks of my job as a Field Tech is that I do not have to take any work home with me. Everything I do for the Company, I do during my shifts while on the clock."[50]

In sum, against this evidence of clear policies prohibiting off-the-clock work and over 30 declarations from FTs across the state saying they were not required to perform uncompensated pre-shift work, Beecher offers self-serving testimony from *four* former FTs who worked in a single location, who themselves did not always perform the pre-shift activities they claim were uniformly required to be performed.  Such evidence is woefully insufficient to establish the existence of a *de facto* classwide policy that violated the law.  *See Gordon*, 299 F.R.D. at 402-03 (testimony from putative class members denying off-the-clock work indicates lack of common policy requiring it); *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 289 (S.D.N.Y. 2015) (anecdotal evidence only indicates *de facto* policy if it reaches "critical mass").  Accordingly, Beecher has failed to establish commonality or typicality, and the Court should deny class certification.[51]

---

[50] Driessler Dec. ¶18.

[51] The cases Beecher relies on in support of his motion are easily distinguishable.  In *three of the five* cases relied on by Beecher, *there was no opposition to class certification*, so it is certainly not surprising commonality was found.  *See Asare v. Change Grp. of NY, Inc.*, No. 12 CV 3371, 2013 WL 6144764 (S.D.N.Y. Nov. 15, 2013) (approving settlement agreement involving alleged common pay practices as applied to a group of 105 employees); *Khait v. Whirlpool Corp.*, No. 06-6381, 2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) (pre-*Dukes* case approving settlement); *Vivaldo v. United Talmudical Acad. of Kiryas Joes, Inc.*, No. 14CV2636, 2015 WL 4922961 (S.D.N.Y. June 18, 2015) (certifying unopposed class of approximately 50 people).  The remaining two cases cited by Beecher involved allegations that the employer had systematically refused to pay overtime to employees at a single location, and there was no indication that pay practices and job requirements differed significantly between putative class members.  *See Morris v. Alle Processing Corp.*, No. 08CV-4874, 2013 WL 1880919 (E.D.N.Y. May 6, 2013) (allegations that food workers at single plant were not paid overtime, including time donning and doffing similar equipment); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 33 (S.D.N.Y. 2007) (pre-*Dukes* case involving allegations that approximately 125 workers at single farm were systematically denied overtime).

**D.     Individual Issues Will Predominate Over Common Ones**

Predominance differs from commonality under Rule 23(a)(2) in that it does not merely test whether there are any common questions, but rather, whether these common questions are so substantial as to make litigating the claims as a class action desirable.   *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997).

> If anything, Rule 23(b)(3)'s predominance criterion is even more demanding that Rule 23(a). Rule 23(b)(3), as an adventuresome innovation, is designed for situations in which class-action treatment is not as clearly called for.

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citations omitted).

Predominance is satisfied only where a class action would not entail "a multitude of mini-trials" on individualized issues, *Kiobel v. Royal Dutch Petroleum Co.*, No. 02-CV-7618, 2004 WL 5719589, at *11 (S.D.N.Y. Mar. 31, 2004) (collecting cases), and would instead "achieve economies of time, effort and expense, and promote . . . uniformity of decision as to the persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results," *Amchem*, 521 U.S. at 615.  As discussed below, individualized issues will predominate over common ones in this litigation, rendering class treatment inappropriate.

1.     Individualized Issues Would Predominate Any Determination as to Whether Each FT Performed Pre-Shift, Off-the-Clock Work.

As discussed above, there are numerous putative class members who did not perform the activities Beecher contends were uniformly required of every FT.  Obviously, such individuals would have no claim against TWC for uncompensated pre-shift work.   Given this record, individualized determinations would have to be made on an FT by FT basis to identify which individuals actually performed pre-shift activities.

Beecher's claim that variations amongst putative class member's pre-shift activities will not defeat a showing of predominance is incorrect and not supported by the case law he cites.

(Motion at 18 n.48.)  In *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 48-49 (E.D.N.Y. 2010), for example, the plaintiffs presented evidence that the employer had an indiscriminate and common "no overtime, period" policy, which the employer defended against by arguing the common defense that the plaintiffs were exempt.  Class certification there was certainly not surprising in light of the common classwide policy and common classwide defense, as the differences between class members merely went to damages, not liability.  Here, the testimony from FTs in the putative class establishes that there was no common policy at all and multiple individual defenses – not merely that damages would differ from class member to class member. Thus, *Alleyne* is easily distinguishable, as are the other cases cited by Beecher.  *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 404 (2d Cir. 2015) (vacating district court's denial of class certification because it was based entirely on conclusion that damages were individualized); *Enea v. Bloomberg, L.P.*, No. 12 CIV. 4656 GBD FM, 2014 WL 1044027, at *4 (S.D.N.Y. Mar. 17, 2014) (stating only that individualized damage determinations will not defeat predominance); *Poplawski v. Metroplex on the Atl., LLC*, No. 11-CV-3765, 2012 WL 1107711, at *10-11 (E.D.N.Y. Apr. 2, 2012) (common policy shown of never paying overtime; individualized determinations of uncompensated overtime did not warrant denial of certification).

Here, unlike the cases on which Beecher relies, the need for individualized inquiries to establish *both* liability and damages shows that Beecher cannot establish predominance.  *See DeSilva v. N. Shore-Long Island Jewish Health Sys.*, 27 F. Supp. 3d 313, 329 (E.D.N.Y. 2014) (predominance not shown where individualized inquiries necessary to determine if employees worked uncompensated overtime); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 148 (2d Cir. Mar. 4, 2015) ("Because liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis, common issues do not predominate over

individual ones and a class action is not a superior method of litigating the case."). Thus, certification is not appropriate here.

     2.    <u>Individualized Issues Would Predominate Any Determination as to Whether TWC Had Knowledge of Particular FTs Performing Pre-Shift Work Off-the-Clock</u>

To establish liability under New York law for unpaid wages, a plaintiff must show that the employer knew or should have known that the plaintiff worked extra hours without compensation. *Joza v. WW JFK LLC*, No. 07-CV-4153, 2010 U.S. Dist. LEXIS 94419, at *24-28 (E.D.N.Y. Sept. 9, 2010) (noting that New York law tracks FLSA with regard to showing necessary to establish claim for unpaid overtime). As shown above, TWC's policies require employees to be paid for all time worked and specifically prohibit FTs from performing most of the activities Beecher complains of off the clock. "In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011). Given, such individualized inquiries, common issues will not predominate in this lawsuit. *Id.*

     3.    <u>Individualized Inquiries Would Be Necessary to Determine Whether Liability Can Be Established Given That Plaintiffs Admit They Were Overcompensated for Their Commutes and Lunch Breaks.</u>

TWC is entitled to defend against liability in this case by showing that any particular FT was not underpaid because, even if the FT did perform some compensable activities off the clock in any given workweek, any such time was eclipsed by the amount of time the FT spent on the clock in violation of TWC policy when he was not, in fact, engaged in compensable work. Indeed, Beecher and his three co-Plaintiffs each admit that they frequently took more than 30 minutes for lunch despite the fact that their meal period was only 30 minutes and TWC

automatically deducted only 30 minutes of time from their pay.[52]   Similarly, Reeves admitted he would frequently drive home on the clock and simply sit at his house for significant periods of time before clocking out.[53]   Obviously, if Plaintiffs performed no work for an hour or more but TWC only deducted 30 minutes from their pay for the meal period (or Plaintiffs commuted or sat at home performing no work while on the clock), Plaintiffs cannot be heard to complain the Company did not pay them for an alleged 15-30 minutes of pre-shift work.   In other words, to prevail on a claim for under-compensation, an FT must show that that was compensated for less time than he actually worked -- a showing an FT cannot make if the FT was paid more for taking overlong lunches, commuting or sitting at home than the time he claims to have spent on uncompensated pre-shift activities.   Making such determinations, however, would require a workweek by workweek analysis for every single class member for the past seven years.   As such, those individualized inquiries would dwarf the alleged common issues in this litigation.

    4.    <u>Individualized Issues Would Predominate Determinations as to Whether TWC's</u>
              <u>*De Minimis* Defense Applies to Particular FTs</u>

"The *de minimis* doctrine permits employers to disregard, for purposes of the FLSA, otherwise compensable work '[w]hen the matter in issue concerns only a few seconds of work beyond the scheduled working hours.'"   *Singh v. City of New York*, 524 F.3d 361, 370-71 (2d Cir. 2008).   Contrary to Beecher's contention, New York law recognizes the *de minimis* defense since it closely tracks the FLSA.   *See Joza*, 2010 U.S. Dist. LEXIS 94419, at *18 ("By rule, New York intends to follow, in close pursuit, the FLSA framework. . . . the facts necessary to establish that a covered employee performed overtime work for which the employee has not received statutory overtime compensation will not [vary].");   *see also Albrecht v. Wackenhut*

---

[52]   *See* Beecher Dep. 125:9-27:5; Dueringer Dep. 190:21-91:15; Reeves Dep. 215:10-17:6, 255:11-59:11, 272:22-74:17, 290:10-91:4, 372:17-73:4; Wilson Dep. 162:11–67:18.

[53]   Reeves Dep. 307:22-19:8, 323:12-32:13.

*Corp.*, No. 07-CV-6162, 2009 U.S. Dist. LEXIS 88073, *30-32, (W.D.N.Y. Sept. 24, 2009) (dismissing FLSA and NYLL claims on basis that alleged uncompensated time was *de minimis*); *Perez v. G&P Auto Wash*, 930 F. Supp. 2d 423, 432, (E.D.N.Y. 2013) (analyzing *de minimis* defense in NYLL/FLSA case); *Rui Xiang Huang v. J&A Entm't Inc.*, 2012 U.S. Dist. LEXIS 184727, *22 (E.D.N.Y. Dec. 3, 2012) (same).

While Plaintiffs contend they spent 15-30 minutes performing various pre-shift activities, many FTs say the *only* work-related activity they performed prior to driving to their job and clocking in was to log into WorkAssure, a process that took only a few minutes on a laptop and, now on the iPad, takes only a few seconds. TWC is obviously entitled to assert a *de minimis* defense against claims involving such minimal amounts of time. *See Reich v. NY City Transit Auth.*, 45 F.3d 646, 652-53 (2d Cir. 1995) (preliminary activities involving minimal amounts of time and effort should be disregarded). Determining whether a particular FT's alleged pre-shift activities are *de minimis*, however, "will necessarily vary widely according to the particular situation of each individual plaintiff." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011); *see also DeSilva v. N. Shore-Long Island Jewish Health System*, 27 F. Supp. 3d 313, 326 (E.D.N.Y. 2014) (*de minimis* determination is individualized). Accordingly, because determination of TWC's *de minimis* defense would necessarily require an individualized, FT by FT investigation, Beecher cannot establish that common issues predominate in this action.[54]

---

[54] Moreover, the necessity of individualized damage inquiries, while not inherently fatal to class certification, "should be considered at the certification stage when weighing predominance issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)). Here, Beecher claims that FTs had to perform numerous pre-shift activities, including booting laptops, loading programs, "routing," loading equipment, checking inventory, etc. The record clearly shows, however, that FTs did not uniformly perform those activities while off the clock (if at all). Thus, even assuming those alleged activities are compensable, highly individualized determinations would have to be made as to exactly what pre-shift activities each FT performed, how often he or she performed them, and how much time

**E.      Beecher's Proposed Class Must Fail as It Is Based on an Inherently Flawed Claim**

The Second Circuit has held that where a claim cannot succeed as a matter of law, "the Court should not certify a class on that issue." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d. Cir. 2008). As shown in TWC's motion for summary judgment, Beecher's claims for alleged pre-shift work fail as a matter of law for numerous reasons, particularly because Second Circuit law holds that the pre-shift activities Beecher complains of were incidental to his commute and thus not compensable. *Colella v. City of New York*, 986 F. Supp. 2d 320, 343 (S.D.N.Y. 2013) (communications to receive assignments, loading tools, refueling, etc. are all incidental to commute and not compensable). Accordingly, Beecher's motion for certification should be denied.[55]

## V.      CONCLUSION

For the reasons discussed above, Beecher cannot meet the requirements for certification under Rule 23. Accordingly, the Court should deny his motion in full.

Dated: February 15, 2016

                              Respectfully submitted,

                              By: */s/ Nathan D. Chapman*
                              Nathan D. Chapman (*pro hac vice*)
                              Joseph W. Ozmer II (*pro hac vice*)
                              Kabat Chapman & Ozmer LLP
                              171 17th Street NW
                              Suite 1550
                              Atlanta, GA 30363

---

was spent on those activities while off the clock. Such individualized questions further demonstrate that Rule 23(b)'s predominance requirement cannot be met here.

[55] The Court has discretion to decide TWC's pending motion for summary judgment before ruling on Plaintiffs' motion for class certification. *See Turner v. GMAC*, 980 F. Supp. 737, 745 n.5 (S.D.N.Y. 1997) (citing *Christensen v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206, 214 (2d Cir. 1987)). Indeed, it makes sense to rule on a pending motion for summary judgment prior to deciding class certification when doing so would "protect both the parties and the [C]ourt from needless and costly further litigation." *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984); *see also Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995).

Telephone: (470) 447-0605
Facsimile: (470) 447-0615


By: */s/ M. Rogan Morton*
ATTORNEY & COUNSELOR AT LAW
21 Rugby Road, Suite 300
Buffalo, NY 14216
Telephone: (716) 432-2764
Facsimile: (716) 408-9571
rmorton@roganmortonlaw.com


*Attorneys for Defendant*
*TWC Administration LLC*